### THE STATE OF KANSAS v. HUGH H. FRY.

1. BILL OF EXCEPTIONS — *No Journal Entry.* A bill of exceptions properly allowed, signed and filed and ordered to be made a part of the record is not void because the clerk fails to make a journal entry thereof.
2. ———— *Aiding Offenders to Escape Punishment.* Section 288 of the act relating to crimes and punishments, and concerning aid given to offenders to enable them to escape punishment, discussed.
3. ———— The evidence discussed, and held to be insufficient.

*Appeal from Crawford District Court.*

THE opinion states the nature of the prosecution, and the material facts. On April 20, 1888, the defendant, *Hugh H. Fry,* was sentenced to imprisonment in the state penitentiary for one year. He appeals.

*D. B. Van Syckel,* for appellant.

*S. B. Bradford,* attorney general, and *Ed. Van Gundy,* county attorney, for The State.

The opinion of the court was delivered by

VALENTINE, J.: This is a criminal prosecution upon an indictment in which it is alleged that the defendant, Hugh H. Fry, gave aid to C. C. Parker for the purpose that Parker might avoid a criminal prosecution. The defendant was convicted and sentenced, and he now appeals to this court. The counsel for the state urge that this court cannot enter into any examination of the merits of the case, for the reason that that portion of the record brought to this court which purports to be a bill of exceptions, is not a bill of exceptions. And this they urge for the alleged reason that the supposed bill of exceptions was not allowed by the court or made a part of the record, but was a mere chambers order. Now this bill of exceptions purports in every respect to be a bill of exceptions; and at its close the following language is found:

" Wherefore, the said defendant presents this his bill of exceptions to the court, and prays the court to allow, sign and seal the same, and make it a part of the record in this case. And the court, on this 21st day of April, 1888, having the above bill of exceptions presented, and having examined the same, finds the same to be a true and correct bill of exceptions in the above-entitled cause, hereby allows, signs and orders the same to be placed on file with the pleadings in said cause, and the same is hereby made a part of the record in this case."

This bill of exceptions is signed by the judge of the court, and filed by the clerk; and it purports to be the action of the court, and not merely that of the judge at chambers. The only thing lacking to make this bill of exceptions perfect in every respect, is a journal entry by the clerk showing that the bill of exceptions was allowed by the court and made a part of the record. But we do not think that this failure on the part of the clerk destroys the validity of the bill of exceptions. (See Criminal Code, § 219; Civil Code, §§ 299 to 303; *Williams v. Hersey,* 17 Kas. 18.) We think the bill of exceptions is sufficient. We shall now proceed to the consideration of the merits of the case.

1. Bill of exceptions, not void —no journal entry.

The principal facts of this case, briefly stated, are substan-

tially as follows: On October 14, 1886, Dr. C. C. Parker's
residence was at Yates Center, Woodson county, Kansas, but
he owned a drug store and had an office at Farlington, in
Crawford county, Kansas.   The defendant, Hugh H. Fry,
with his family, resided on a farm about three miles west of
Farlington, and about seven or eight miles north of Girard.
Henry G. Brown, with his family, including his daughter,
Sarah R. Brown, resided about a quarter of a mile west of
Fry's, on a farm belonging to a man by the name of Hether-
ington.   He had formerly resided on Fry's farm.   On that
day, October 14, 1887, and just before sundown, Sarah R.
Brown, with the consent of her parents, started from her home
and from Fry's to take an all-night's ride in the direction of
Independence, Montgomery county, Kansas, with Dr. Parker,
in a buggy drawn by two horses.   She was then fourteen years
and ten months old.   They passed through Brazilton, in Craw-
ford county, and some distance beyond and near to the county
line between Crawford and Neosho counties, when Dr. Parker
stopped to feed his horses.   It was then dark.   He removed
the horses from the buggy, fed them, and then returned to the
buggy, where Sarah R. Brown still remained.   They then had
sexual intercourse.   No force was used, and nothing done that
would render such intercourse rape at common law, or under
the statutes as they existed prior to June 20, 1887.   But it
was rape, however, under § 31 of the act relating to crimes
and punishments as that section was amended by chapter 150
of the Laws of 1887, for the girl at that time was under eigh-
teen years of age, and was therefore not capable under the
statute of giving her consent.   Immediately afterward, Dr.
Parker hitched the horses to the buggy, and they then passed
on through other towns, among which, as the girl thinks,
were Parsons and Cherryvale.   At Cherryvale they stopped
for some time.   They then passed on to Independence, arriv-
ing there about noon on October 15, 1887, when they separated,
Sarah R. Brown going by railroad to Yates Center, where she
expected to stay and did stay for some time at Dr. Parker's
house and with his wife, Mrs. Parker.   Dr. Parker returned

to Farlington. Sarah R. Brown afterward returned to her father's home. She says she returned about December 16, 1887, but from the other evidence she must have returned sooner. She was certainly at home on December 15, 1887. She says she never told anyone anything concerning her sexual intercourse with Dr. Parker until she told her mother, and that she did not tell her mother until she had been at home about a month. Probably she told her mother sooner, for she told her mother on December 16, 1887. She did not tell her mother, however, until after her mother had ascertained that her monthly courses had ceased, and until her mother had become uneasy about it, and had questioned her closely as to whether or not she had not been with some man. She then told her mother that she had been with Dr. Parker. The day previous to this, however, she with her father and mother visited Dr. Parker's office for the purpose of obtaining from him some medicine to start her courses, which medicine they obtained. Dr. Parker at the time, but probably in the absence of her father and mother, and while she was alone with him, desired to make an examination of her, but she refused to permit him to do so. In a short time after this, as she testified, she "came around all right."

As before stated, she told her mother on December 16, 1887, which was the next day after they had been at Dr. Parker's office, of what had occurred between her and Dr. Parker during their night's ride in October. Her father was away from home at the time. That morning he had taken a load of corn for Fry to Girard. He returned just after noon. On his way home he saw Dr. Parker's team at John Doctor's. When he returned home the girl's mother told him what the girl had told her. According to the testimony of Andrew W. Fry, who was near by at the time, the girl's father then made threats of killing Dr. Parker. The girl's father, however, denied this, or partially denied it. On the same day and in the afternoon of that day, the girl's father, Brown, went to the defendant Fry's house and communicated to Fry what had occurred between Dr. Parker and his daughter. Fry and

his wife testified that Brown at that time made threats of per-
sonal violence to Dr. Parker, but Brown denied, or partially
denied the same, and testified that he said that he "could,"
and not that he *would* "cut his [Dr. Parker's] d——d heart
out as easy as I [Brown] could stick a hog for meat." At
the same time, and before that time, Fry and his wife were
sureties on certain notes for Dr. Parker, to the amount of
three or four hundred dollars, and Parker also owed Mrs. Fry
for money loaned by her to him. Indeed, up to this time
the Frys and Dr. Parker had been intimate friends. These
business matters were spoken of at this time between Brown
and Fry, but as to just what was said about them there is a
conflict in the evidence. Brown testified that he said to Fry
on this subject as follows: "I says, I am sorry for you, and
my opinion is, the best thing you can do is to go and notify
the parties you are owing it to, you will not stand good for
Parker another minute." Fry testified that Brown told him
to go to Farlington and see Dr. Parker, and get his name off
the notes. Brown testified that he had intended to go on to
Farlington that afternoon, but that he changed his mind at
the suggestion of Fry, and went to Girard. He went to
Girard for the purpose, as he stated, and as he stated he told
Fry, of getting a warrant for Dr. Parker; but he did not get
it that day inferably, from what he stated, for the reason that
it was not then sufficiently known whether the supposed of-
fense of Dr. Parker was committed in Crawford county, or
in some other county. As Brown returned from Girard on
that day, or rather evening, he again stopped at Fry's and had
further conversation with Fry. On the next day, October 17,
1887, in the morning, Brown again went to Girard, taking with
him at that time his wife and daughter, Sarah R. Brown, and
two small children. On his way he again stopped at Fry's and
had some conversation with Fry. On the same day, and soon
afterward, Fry started to go to Girard, taking with him his
wife Clarinda Fry, and Miss Clemie Michael, the school
teacher for that district, who was then making her home at
Fry's. He went about three miles out of his way for the

purpose of also going to Farlington. When he arrived at Farlington he went into Dr. Parker's office, leaving the two women in the wagon. Dr. Parker was in his office at the time. Fry soon called for Mrs. Fry, and she also went into Dr. Parker's office, leaving Miss Michael alone in the wagon. They remained in the office a few minutes and then returned to the wagon, and then left Farlington and went on to Girard. What was said during the time by Fry or his wife, or Dr. Parker, is not shown by any evidence in the case, except that of Fry and his wife. They stated that nothing was said with regard to the transaction had between Dr. Parker and Sarah R. Brown, or with reference to any prosecution or warrant, and that nothing was said with respect to any matters except the debts owing by Dr. Parker and for which they were surety, and that their only object in visiting Parker was to obtain better or other security with reference to such debts. Afterward, other security was furnished to them, but none at that time. In about half an hour or an hour after they had left Farlington, which was about 9 or 10 o'clock in the morning, Dr. Parker had his team hitched up to his buggy, and got into his buggy, taking with him his clerk, W. M. Jones, and went south in the direction of Girard and of Pittsburg, stating that he was going to Pittsburg and then to Yates Center. He had previously, on that day and the day before, stated that he was going away on that day to be gone a few days, and that he was going to Yates Center. He passed within a half-mile or a mile of Girard, where his clerk got out of the buggy and walked to Girard. Where Dr. Parker then went is not shown by the record. He has not, however, been seen since that time in Crawford county. He however sent additional security to Fry, dated as of that date. In the evening of that same day a warrant was issued for the arrest of Dr. Parker upon the charge of committing a rape on Sarah R. Brown, but it is not shown that he has ever been arrested upon it. On January 18, 1888, the grand jury of Crawford county returned an indictment against Fry, charging that he "did give to said C. C.

Parker aid and information that a warrant was about to be issued for his [said Parker's] arrest on said charge, with the intent and in order to aid the said C. C. Parker that he [said Parker] might escape and avoid arrest, trial and conviction therefor; contrary to the statute in such case made and provided, and against the peace and dignity of the state of Kansas." Upon this charge Fry was tried and convicted. He was tried before the court and a jury in April, 1888, and sentenced on April 20, 1888, to imprisonment in the penitentiary for the term of one year; and from this sentence he now appeals to this court.

If the evidence in this case is sufficient to send a man to the penitentiary, then no man's liberty is safe. But before commenting upon the evidence, we shall consider some preliminary matters. The statute upon which this prosecution is based reads as follows:

"SEC. 288. Every person who shall be convicted of having concealed any offender after the commission of any felony, or of having given to such offender any other aid, knowing that he has committed a felony, with the intent and in order that he may escape or avoid arrest, trial, conviction or punishment, and no other, shall be deemed an accessory after the fact; and upon conviction shall be punished by confinement and hard labor not exceeding five years, or in the county jail not exceeding one year nor less than six months, or by fine not less than four hundred dollars, or by both a fine not less than one hundred dollars and imprisonment in a county jail not less than three months." (Comp. Laws of 1885, ch. 31, § 288.)

It is not claimed that the defendant in this case, Fry, ever "concealed" the offender, Parker; but it is claimed only that he gave to such offender "other aid," and this "other aid" claimed to have been given was merely information claimed to have been given by Fry to Parker that a warrant was about to be issued for Parker's arrest. This "other aid" was mere words. Now can words alone constitute the

2. Aiding offenders to escape.

"other aid" contemplated by the statute? Or should such "other aid" be something of a more substantial character, like the furnishing of personal help; or

the furnishing of a horse or a horse and buggy, or some other means of transportation or escape; or the furnishing of a key or some other instrument with which to unlock doors or to remove or overcome other barriers; or the furnishing of a room or a cellar or some other place in which to hide? It has been held in other states that mere words cannot constitute the kind of *aid* contemplated by certain statutes of such states. (*Wiley v. McRee*, 2 Jones, [N. C. Law] 349; *Hughes v. The State*, 1 English, [Ark.] 131.) Besides, the statutes of this state with reference to accessories before the fact still make any person who "*counsels, aids or abets*" in the commission of any offense, not only liable as an accessory before the fact, but they also provide that he may be charged, tried and convicted in the same manner as if he were a principal. (Crim. Code, § 115.) But our statutes with reference to accessories after the fact, unlike our statutes with reference to accessories before the fact, do not use the words "counsels" or "abets;" nor do they make any person liable as an accessory after the fact unless he *conceals* the principal offender, or gives to him some "other aid." (Crimes Act, § 288, above quoted.) These statutes concerning accessories after the fact do not use the word "counsels," or "abets," or any other word less strong than the words "conceal," or "aid." An accessory after the fact may, however, be charged, tried and punished, though the principal be neither charged nor tried. (Crim. Code, § 116.) The question, however, as to whether the words "other aid" as used in the statute above quoted require more than *mere words*, or not, we shall not now decide, but shall assume that mere words are sufficient if the other elements of the offense as contemplated by the statute are sufficiently set forth and shown. And upon this assumption, was it shown that the defendant is guilty of the offense charged against him? There was no evidence introduced in this case that showed that Fry ever used words before or after the time when Parker left Crawford county that would make Fry liable. There is no evidence that Fry ever stated to any person before or after that time that Parker was guilty of any offense, or that any prosecution would ever

be commenced against him, or that any warrant would ever
be issued for him, or that any attempt would ever be made to
arrest him.    We shall assume in this case that Parker com-
mitted the offense of rape, charged against him, as such offense
is defined by § 31 of the act relating to crimes and punish-
ments as amended by chapter 150 of the laws of 1887.    We
shall also assume that he absconded from Crawford county on
or about December 17, 1887, for fear of being arrested for
that offense.    But why did he abscond at that time?    Was it
because of any words which Fry used in his presence?    Or
was it from some other cause?    Parker knew that he had
committed the offense.    And probably, from the evidence in
the case, he believed on the day on which he absconded and
for two days prior thereto, that the girl was pregnant.    He
knew that the girl's courses had stopped.    Also, on the morn-
ing after Brown and his wife and daughter had been at Par-
ker's office, and after Parker had ascertained that the girl's
courses had stopped, and on the morning of the day before
Parker absconded, Brown went to Girard, and Brown saw
Parker's team at John Doctor's house, and probably Parker
saw Brown.    Brown also in the afternoon of that day went
to Girard as he stated for a warrant to arrest Parker, and he
probably communicated the fact of Parker's offense to several
persons, and they to others; and probably also Brown made
many threats.    Parker possibly knew of this.    But when did
Parker form the intention to abscond?    On the day before
he absconded he was out riding, and probably knew, as before
stated, that Brown had been to Girard.    He was at John Doc-
tor's, and, as before stated, Brown saw Parker's team there
and probably Parker saw Brown, and Parker at that time
stated to Mrs. Doctor that he expected to go away the next
day.    Did he then have the intention of absconding?    Or
did he form the intention of absconding on the next day, the
day on which he did abscond?    And if he formed the inten-
tion on this last-mentioned day, then at what time of the day?
It is said that on the morning of that day, and after he had
seen Fry, he acted hurriedly and excitedly, and very soon

afterward left Farlington. But may he not have had some other reason for so acting if he did so act? And when he left Farlington he went toward Girard, the place where the warrant was to be procured, and not in the opposite direction; and all this was in broad daylight. May he not on the day on which he absconded have met some person near Girard who communicated to him what was occurring, and may he not then have formed his intention of absconding? Or did he even at any time during that day form such intention? May he not on the next day or some other day afterward have formed such intention?

But passing over all these matters as of but little consequence, and supposing that Fry may have said something on the day that he was at Parker's office that caused Parker to abscond, still is Fry guilty? As before stated, there is no evidence that Fry ever communicated a word to Parker or to anyone else that would render Fry in the least guilty; and Fry testified on the trial that he did not so communicate any such thing, and Fry's evidence in this respect is uncontradicted. The fact that Fry wanted additional security, may, with the other facts of which Parker had knowledge, have given Parker the alarm, and may have caused Parker to leave the county; but that would not render Fry guilty of any offense. Suppose that when Fry went into Parker's office Fry had even stated to Parker that he (Parker) was about to get into trouble, or that a criminal prosecution was about to be commenced against him, or that a criminal warrant was about to be issued for him, or that he was about to be arrested, would even that have made Fry guilty of any offense *unless Fry intended at the time to thereby enable Parker to escape?* If Fry went to Parker's office, and to see Parker, only for the purpose of obtaining additional security on the notes on which Fry and his wife were surety, and only incidentally and in connection with his business communicated this other matter to Parker, then Fry would certainly not be guilty of any offense. If Fry had gone into Parker's office for any legitimate object, and in accomplishing that object had incidentally stated to Parker that a

warrant was about to be issued for his arrest, but without any intention of enabling Parker to escape, that would not render Fry guilty, even if Parker, because of such information, had accomplished his escape.    To constitute this offense there must always be a *guilty intent.*  ‘ The statute itself upon which this prosecution is based says that the aid must be given “with the *intent and in order* that he [the principal offender] may escape or avoid arrest, trial, conviction or punishment, and no other.” (See Crimes Act, § 288, above quoted; and *The State v. Reed,* 85 Mo. 194.)   But there is no evidence in this case that Fry ever communicated anything to Parker that would cause Parker to want to escape or to leave Crawford county, and the uncontradicted evidence of Fry is that he did not communicate any such thing.   Nor was there any evidence introduced to show that Fry intended or desired that Parker should escape or leave Crawford county or avoid arrest or trial or conviction or punishment.   Upon all these matters there is a total lack of evidence to prove the affirmative, and only evidence on the other side.   If Fry had really desired to give information to Parker so that Parker could escape, he could have given such information the evening or the night before, and thereby have given Parker a better opportunity to escape. But Fry did not go to Parker's that evening or that night, but waited until the next morning and then went in broad daylight.   Many years ago, away back in the early history of Kansas, it was held by this court as follows:

“A few facts, or a multitude of facts proven, all consistent with the supposition of guilt, are not enough to warrant a verdict of guilty; but in order to convict on circumstantial evidence, it is held necessary not only that the circumstances all concur to show that the prisoner committed the crime, but that they all be inconsistent with any other rational conclusion.” (*Horne v. The State,* 1 Kas. 42, 72.)

In the present case the facts proved are not only not inconsistent with the defendant's innocence, but the uncontradicted evidence of the defendant is wholly inconsistent with his guilt. There is no evidence of any words ever being uttered by Fry,

either before Parker left Crawford county, or at the time, or afterward, tending to show that Fry desired Parker to leave the county, or that he gave Parker any information with reference to any intended prosecution against him.

It is claimed on the part of the defendant that the court below committed many errors in the admission of evidence and in giving instructions, but as we believe the verdict and judgment in this case are wholly unsustained by the evidence, we have concluded to pass over all other questions, and to decide the case merely upon the question of the sufficiency or insufficiency of the evidence.

3. Evidence insufficient to sustain verdict.

Believing the evidence to be wholly insufficient to sustain the verdict and judgment, the judgment of the court below will be reversed.

JOHNSTON, J., concurring.

HORTON, C. J.: Conceding, for the purposes of this case, that Fry imparted the alleged information to Parker; and conceding that §288 of the act regulating crimes and punishments is broad enough to embrace within the words "any other aid," the imparting of information, I cannot, upon the evidence preserved in the record, consent to the affirmation of the sentence imposed, because, to my mind, it clearly appears that if Fry imparted the alleged information to Parker, he did not do so solely that he might escape justice. There is no positive evidence showing, or tending to show, that Fry imparted any information or warning to Parker for the purpose of aiding him to escape.

If we roam over into the possibilities and the uncertainties of the case, and say that the acts of Fry and Parker indicate that Fry gave him the alleged information or warning, the answer to all this is, that after Fry had been told by Brown of the ravishment of his daughter, he had ample reason to see Parker at once on account of their business matters, and for his own security. If he had omitted to see Parker, after being informed of the trouble he was in, he would not have acted as an ordinary prudent business man. The business

connections between the parties are not controverted. If, in order to obtain better security from Parker, or in consulting with him concerning their business affairs, he imparted all the information that Brown or others had given him, and this was not done with the intent that Parker might escape or avoid arrest, he would not be guilty within the statute of any offense whatever. No one can be deemed guilty under the section of the crimes act referred to, who aids a felon, not in order that he may escape from justice, but for some other purpose. (*The State v. Reed,* 85 Mo. 194.)