THE STATE OF KANSAS v. ALMIRA DOTY.

No. 10745.

ACCESSORY AFTER THE FACT — *mere misprision of felony does not make one liable as.* D. and his step-daughter, who was under the age of consent, were criminally intimate, and about the time a child was born to the daughter she informed her mother that D., the husband of the mother, was the father of the child. The mother then told her daughter to say to the officers of the law, if inquiry was made, that another than D. was the father of the child; and the daughter made the statement as the mother advised. Within a few days thereafter, D. was arrested and convicted of the offense of rape. *Held*, that the mere advice of the mother to her daughter to tell an untruth about the paternity of the child does not make the mother an accessory after the fact,. nor constitute a crime within the meaning of paragraph 2562,. General Statutes of 1889.

*Error from Sumner District Court.*
*Hon. J. A. Burnette, Judge.*

REVERSED.                    OPINION FILED MARCH 6, 1897.

*L. C. Boyle,* Attorney General, and *John G. Woods,* and *H. L. Woods,* County Attorney, for The State.

*W. H. Staffelbach* and *Haughey & McBride,* for appellant.

JOHNSTON, J.    The appellant was convicted of giving her husband, who had committed the offense of rape, aid, with the intent and in order that he might escape arrest, conviction and punishment.    Charles Doty and Almira were husband and wife, and Nannie Williams was the daughter of Almira by a former husband; and they lived together as a family in Oxford, Sumner County.    Nannie was 16 years old on February 4, 1896, and it appears that Doty had been having sexual intercourse with her for about three years before that time.    On June 10, 1896, she gave birth to a child, which lived but a few hours.    Two days before the birth of the child, a physician was called to see Nannie, and, after an examination, told her mother, Almira Doty, that the girl was pregnant. After the doctor went away, the mother asked the daughter who was the father of the unborn child, and was told that it was Charles Doty.    Afterward, Mrs. Doty told her daughter that she wished they could say it was some one else, and not Doty.    Two days later the child was born, and Mrs. Doty inquired of the doctor if Nannie could be moved so they could get away from Oxford, but the doctor said she could not.    She then suggested that the matter be kept quiet, and asked the doctor to withhold a report of the birth to the State Board of Health.    Two days

later, she told the doctor that he might make his report. It appears that a conference had been had between Charles Doty, Almira Doty and Nannie Williams in regard to charging the paternity of the child upon some one else than Charles Doty, with a view of shielding him from the consequences of the crime. It was agreed among them that, upon inquiry, Nannie should say that the father was Henry McPierson; and, in accordance with the agreement, Nannie told the County Attorney and the Sheriff, who questioned her, that McPierson was the father of the child. Among other things they told her to say, was, that she had met McPierson in the schoolhouse grounds in July, 1895, and had there had sexual intercourse with him; that he had just come from the " Strip "; that he went from Oxford to Belle Plaine; that he wrote her from Belle Plaine in November, 1895, to meet him at the schoolhouse grounds on a certain evening; that she met him as suggested in his letter, and again had illicit intercourse with him; that, at the meeting in November, he told her that he was going to Indiana; that, from and after that meeting, she never saw him again or heard from him. It was also suggested to her that if she should only name one person the County Attorney might not believe it, and that she had better name two persons; and she was told by her mother to say that the other person was Ezra Shriver. Shriver lived in the community, but it appears that there was no such person as Henry McPierson. Her mother advised her to adhere to the story which she had told to the officers; that she might be sent to the House of Correction, but the term would not be long, and that that would be better than to have Doty go to the penitentiary. About the time she told this story, and on June 15, 1896, Doty was arrested, charged with

the crime of rape. He waived a preliminary examination and was bound over to the District Court for trial. On June 30, 1896, he was arraigned in the District Court, entered a plea of guilty, and the Court entered judgment on the plea, sentencing him to the penitentiary for the period of 21 years. Shortly afterward, his wife, Almira Doty, was arrested, tried and convicted as an accessory after the fact.

The prosecution was brought under section 422 of the Crimes Act, which reads :

"Every person who shall be convicted of having concealed any offender after the commission of any felony, or of having given to such offender any other aid, knowing that he has committed a felony, with the intent and in order that he may escape or avoid arrest, trial, conviction or punishment, and no other, shall be deemed an accessory after the fact; and, upon conviction, shall be punished by confinement and hard labor not exceeding five years, or in the county jail not exceeding one year nor less than six months, or by fine not less than four hundred dollars, or by both a fine not less than one hundred dollars, and imprisonment in a county jail not less than three months." (Gen. Stat. 1889, ¶ 2562.)

The main question presented for decision is whether what was said and done by Almira Doty brings her within the condemnation of this statute. In fact, it seems that nothing was done by her to conceal her husband or to aid him to escape ; at least there were no overt acts. In her distress, occasioned by the shame of her daughter and the perfidy and crime of her husband, she did ask her daughter to tell an untruth as to the paternity of her child ; but there was no act, nor anything more than mere words. We think that the part taken by her in the transaction does not make her an accessory after the fact, nor make her amenable under the quoted statute. The word "aid,"

in its broader signification, might include assistance like the failure to disclose a felony by one having knowledge of its commission, or assisting the offender in obtaining witnesses to testify in his behalf, or giving untruthful testimony in his behalf at the trial. While these might aid the offender in escaping punishment, it certainly is not such aid as the statute contemplates. The character of the aid is indicated by the particular words used in the commencement of the section, and it shows that it must be some substantial act of personal assistance. It will be observed that the concealing of an offender is first mentioned, and then there is added the giving of such offender any "other aid," and the argument may well be made that the other aid is of a similar character with that particularly specified. It is a familiar rule of interpretation that where particular words are followed by general ones, the latter are to be held as applying to persons and things of the same kind with those which precede. In *Wren v. Commonwealth*, 26 Gratt. 956, in speaking of the character of aid given to a felon which would make a person liable as an accessory after the fact, the court said that it was such as

"That he concealed him in the house, or shut the door against his pursuers until he should have an opportunity to escape, or took money from him to let him escape, or supplied him with money, a horse, or other necessaries in order to enable him to escape, or that the principal was imprisoned and the jailer was bribed to let him escape, or conveyed instruments to him to enable him to break prison and escape. This and such like assistance to one known to be a felon would constitute a man accessory after the fact. . . . But merely suffering the principal to escape will not make a party accessory after the fact, for it amounts at most but to a mere omission. Or if he agree for money not to prosecute the felon, or if know-

ing of a felony, fails to make it known to the proper authorities. None of these acts would be sufficient to make a party an accessory after the fact. If the thing done amounts to no more than the compounding a felony or the misprision of it, the doer will not be an accessory."

See, also, *The State v. Fry*, 40 Kan. 311; Wharton's Crim. Law, § 241; 1 Am. & Eng. Encyc. Law (2d ed.), 269.

The defendant gave no personal assistance of this kind, and the mere fact that she asked her daughter to tell the County Attorney a falsehood with respect to the paternity of the illegitimate child, although reprehensible, does not, in our opinion, constitute the aid which the statute contemplates, or amount to an offense under the statute. It appears that the advice of the mother and the falsehood of the daughter were not an aid to Doty, in any sense, as a warrant for his arrest was obtained on the same day that the fabricated story was told to the officers, and he was arrested some time before Nannie disclosed what are deemed to be the real facts in the case. Within a few days after the mother had heard of the criminal intimacy between her daughter and husband the latter was arrested, convicted, and sentenced. It appears that the officers of the law were not misled by the telling of the untrue story, nor did Doty obtain any aid or advantage thereby. However, we rest our decision on the view that the statute under which the prosecution was brought does not cover or include the misconduct of the appellant.

The judgment will, therefore, be reversed and the appellant will be discharged.

All the Justices concurring.