THE STATE OF KANSAS v. JOHN DIEBOLT.

MURDER — *Conviction* — *Insufficient Evidence.* To sustain a conviction of murder, every element of the crime must be established by competent evidence; and where this court can say from the record that every fact shown by the testimony is consistent with the innocence of the defendant, the conviction must be set aside. In this case it is *held*, that there is not sufficient evidence to uphold the verdict.

*Appeal from Doniphan District Court.*

PROSECUTION for murder. All the material facts are stated in the opinion herein, filed October 6, 1894.

*Fenlon & Fenlon,* for appellant.

*John T. Little,* attorney general, and *Alcid Bowers,* county attorney, for The State.

The opinion of the court was delivered by

ALLEN, J.: The appellant was convicted in the district court of Doniphan county of murder in the second degree, and sentenced to confinement in the penitentiary for 10 years. There is very little conflict in the evidence. The important facts, as testified to by the witnesses for the state, are as follows: The defendant is a boy about 17 years old, who resided with his mother on a farm, a short distance from Denton, in Doniphan county. A party of young men, on the evening of September 8, 1893, went into a melon patch on the Diebolt farm, with the previous knowledge and consent of the defendant, for the purpose of getting some melons, and also

of having some fun by scaring one Marion Cornelius Pinyard, who was one of the party. As a result, Pinyard was shot and killed, and the defendant has been convicted of having purposely and maliciously killed him. Frank Buck, a witness for the state, testified, among other things, that he was 40 years old.

"Q. Prior to that time, what arrangement, if any, had you made to go the watermelon patch of the defendant Diebolt? A. A few evenings before that I was over northeast of Denton there, on Mr. Kirwin's place, and a fellow by the name of Wickline—I believe his name is—I won't say positive that that is his name—got some peaches, and came back by Mr. Diebolt's there, and drove in the barnyard there, and saw Johnnie and spoke to him in regard to coming down there to get some melons, to have some fun with this young Pinyard, some evening in the future.

"Q. What did John Diebolt say to that? A. He said that was all right; for us to come on; we could have all the melons we wanted.

"Q. State all that he said to you at that time. A. I asked Johnnie if he had a shotgun, and he says, 'Yes, I have got a shotgun and revolver both'; I says, says I, 'Fetch up the shotgun, and load it with just powder and paper'; says I, 'I want to have a little fun out of Neil.'

"Q. What did he say to that? A. He said, 'All right.'

"Q. What did you say as to fixing a time? A. I told him that I would let him know in regard to the time that we would be down there. I could not say just at what time we would be there."

On the evening of September 8, Buck met Murray, Redebaugh, Pinyard and Black near the railroad crossing just east of Denton. He also met the defendant and George Palmer, a colored man who worked for the Diebolts, on their way to town. Buck, Pinyard, Murray, Redebaugh and Black started down the railroad toward the melon patch, but Black turned back after going part way. The balance of the party went on past the Diebolt place, where they stayed until they heard Diebolt and Palmer return from Denton. Buck then further testified:

"We waited there until we heard Diebolt and Palmer com-

ing down the track singing. We heard them coming down the track, and we waited until they turned in somewhere about the crossing that they had to cross the railroad there— I suppose somewhere about the gate there where they left the railroad track. I went over inside of the field there, and met them in there—met them somewhere about the end of the melon patch—and we walked on up the road together, going up towards the house, and was talking in regard to the location in the patch; and I went back then, and met Mr. Murray and Redebaugh and Cornelius Pinyard at the south end of the patch. They had gotten over inside of the right-of-way then, and at the south end of the patch was muskmelons. I told the boys 'The watermelons is further out this way,' and I says, 'We will go round up in this road along the fence.' We went up until I thought we was coming to about where the melons was, and we went across those potato rows there, and through the corn, and into the melons. We was walking along up through the melon patch there.

"Q. When you went up with John Diebolt and Palmer— up towards his house— what did you say to them? A. I told Mr. Palmer—he said he did not know which one of the boys it was, to a certainty, in the dark there, was Pinyard. I told him how Mr. Pinyard was dressed. The arrangement was, that when we got in there, that Mr. Palmer was to catch Mr. Cornelius Pinyard and hold him until Mr. Murray was to fire the shot, and then he was to fall—that is, Palmer was to fall—and commence hollowing that he was shot.

"Q. Did John Diebolt hear that conversation? A. Yes, sir.

"Q. What, if anything, was said by you in regard to the manner in which Pinyard was dressed? A. I told him that he had on dark pants, a dark vest, and a light shirt, and a brown hat."

On cross-examination he testified:

"Q. And the colored man was to gather Pinyard and hollow and scream, and then Murray was to shoot a gun off? A. Yes, sir.

"Q. And then the colored man was to fall and hollow he was shot, and scream? A. Yes, sir.

"Q. After that, Diebolt was to fire a shot into the air? A. Yes, sir."

On his direct examination, the witness further testified, as follows:

"Q. Well, after you had passed by the muskmelons up towards the watermelons, what was the next thing that was done?    A. We was walking along the melon patch—along through the melon patch—and the first thing that I knew Mr. Palmer jumped up. He hollows out, 'you————, I've got you now,' or something to that effect.    I think that is about the exact language.    He grabbed hold of Mr. Murray, and there was a kind of commotion there for just a little bit, and he let loose of Murray and started to run toward the east, and Murray and myself we run off in a southwesterly direction a few steps, and Murray, he jerked his pistol out of his pocket, and shot in a southwesterly direction, threw up his arms in that manner, and I looked around to see whether the colored man would carry out his part of the programme, and when the pistol shot was fired off, that is, when I looked around, I saw Palmer drop and commence hollowing————

"Q. What did Diebolt do?    A. Well, when I saw Diebolt he was running after Pinyard.    That is, the next I saw of him after he raised up out of those rows of corn, he was running after Pinyard.

"Q. How far behind Pinyard?    A. Oh, he was a few feet behind him.

"Q. What direction was Pinyard running?    A. He was running in a southeasterly direction.

"Q. Who fired the first shot that you heard that evening? A. John Murray fired the first shot that I heard there that evening.

"Q. Was there any other shots fired?    A. When I looked around to see Palmer fall, I saw John Diebolt throw his hand up and fire—fire a shot.

"Q. What direction did he fire?    A. Well, he was running to the southeast; and he threw his arm up, kind of off from him like, and the flash of the pistol was upwards.    It was an upward direction, with the flash from the pistol, and rather to a—might be a—southerly direction, that is, more south, the way he held his arm.

"Q. What was the next thing you heard?    A. Well, there was considerable hollowing down there.    The colored man was hollowing and groaning there, and Johnnie was hollowing—considerable hollowing being done.    I didn't pay

very much attention to the hollowing, only I noticed there was considerable hollowing being done by some of the party.

"Q. Well, did you hear any more shooting after John Diebolt shot? A. Why, in a short time after that I heard a shot down in a southeasterly direction from where we were laying there in the grass—Mr. Redebaugh, Mr. Murray, and myself.

"Q. Well, what was the next thing that was said or done after the third shot was fired? A. The next that I knowed anything in regard to where Mr. Diebolt was, Mr. Diebolt came running back. He says, 'Boys, Pinny is hurt'; that is, 'Pinny,' or 'Neil,' or something; I could not say exactly the words he used in regard to calling his name."

It appears that Pinyard and Diebolt had gone out of the field in which the melon patch was located across the corner of a little pasture to the fence of the railroad right-of-way. Pinyard was found a little way over the fence, lying on his face unconscious, with a gunshot wound in the back of his head. On the way down to where Pinyard lay, Buck asked Diebolt how it happened, to which Diebolt answered, "I was running, and ran into the wire fence, and the pistol went off accidentally—went off over in the direction of where Pinyard was." Palmer, the colored man, was sent after the doctor, and soon afterwards Diebolt also started after the doctor. Diebolt at all times claimed that his pistol went off accidentally. From all the evidence in the case, there seems to be no doubt that the wound received by Pinyard was produced by a pistol shot from the hand of the defendant. Was this wound purposely inflicted? As tending to show malice, we are cited to the testimony of Joseph Whitney, who testified that, in a conversation a short time before the shooting, speaking of Pinyard, the defendant said, "The bastard can't play ball," and "I would like to slap him," or something of that kind. The same witness testified that on the evening of the shooting he overheard Diebolt say to somebody else something like this: "This is what will get them—damn them —if they go into my watermelon patch."

The rule is elementary that, to sustain a conviction, the

evidence which is accepted as true by the jury must not only be consistent with the guilt of the defendant, but inconsistent with his innocence. (*Horne v. The State,* 1 Kas. 47; *The State v. Grebe,* 17 id. 458; *The State v. Fry,* 40 id. 311.) What fact developed by the evidence in this case is inconsistent with the claim that the defendant's pistol went off accidentally and inflicted the fatal wound? When viewed in the light of the principal facts in the case, we think the testimony of Whitney is too trifling to merit serious consideration. A statement of a boy 17 years old that he would like to slap another boy cannot be distorted by any sensible person into an expression of such malice as would induce him to take life. Such expressions among boys are entirely too common, and ordinarily too meaningless, to be given any weight. The other expression which Whitney claims to have overheard, that "This is what will get them," would show malice against the others as much as against Pinyard. On the other hand, the whole testimony offered by the state shows that the plan to scare young Pinyard was not laid by the defendant at all, but was first communicated to him by the witness Buck, a man 40 years old. That plan was, that firearms should be used for the purpose of frightening Pinyard, and the defendant was expected to play his part. The impression to be conveyed to Pinyard was, that Diebolt was shooting at those in the patch because they were stealing melons. All of the witnesses who were in the melon patch that night testified that all parties were entirely friendly and good-natured. Palmer and Diebolt came back from Denton singing. It seems that Pinyard was informed before he went into the patch that a plan had been laid to scare him; but, notwithstanding the fact that he was forewarned, he evidently was thoroughly frightened. With the exception that the colored man made a mistake and grabbed Murray, the programme was carried out as prearranged. The defendant appears to have chased the deceased somewhere about 200 feet. Nothing could be more natural than this in carrying out the plan. Is there anything unreasonable or improbable in the state-

ment of the defendant thas his pistol went off accidentally? His actions after the shooting are much more consistent with innocence than with guilt. There can be little, if any, doubt that the fatal shot struck Pinyard just after crossing the right-of-way fence, nor can there be serious doubt that at that time the defendant was close to the fence.

It is argued that because the defendant says the pistol was in his hand, hanging down by his side, the deceased could not have received a wound in the back of his head while the pistol was so held. The defendant says he thinks he threw his hand up as he struck the fence. This is natural and probable. We think there is nothing like certainty as to the position of these parties at the time the fatal shot was fired. The night was rather dark, and it is not probable that the defendant knows just what position he was in when he ran into the fence, just where the deceased was, or just how he held his pistol. That he did run into the fence, as he testified, is corroborated by the fact that his clothes were torn. The sport engaged in by these parties was reprehensible. The use of firearms for the purpose of terrifying anyone in the night, as was done in this case, should never be indulged in. Those who planned and all who participated in the scheme are at fault, but it does not follow that all, or any of them, are murderers. If the shooting was accidental, the defendant is not guilty. Every fact disclosed by the testimony is entirely consistent with his claim that the pistol was discharged accidentally. We are well aware that the verdict of a jury and the approval of the trial court should not be disturbed upon any view of this court as to the relative weight of conflicting testimony, but after a most careful scrutiny of the evidence in this case, we are unable to say that there is enough to support the verdict. The judgment is therefore reversed.

Murder—conviction—insufficient evidence.

All the Justices concurring.