THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.*
MARY MURPHY, Appellant.

Fourth Department, July 6, 1920.

**Crimes — murder, second degree — insanity of decedent — evidence
not justifying conviction.**

On appeal from a judgment convicting the defendant of the crime of murder
in the second degree, it appeared that the decedent, who suffered from
senile dementia and who had been incarcerated in several insane asylums
and who showed a marked suicidal tendency, was found strangled with a
wire after his release from an asylum against the advice of the attendant
physicians. Evidence examined, and *held*, insufficient to establish beyond
a reasonable doubt that the decedent met his death at the hands of the
defendant rather than by suicide and that a new trial should be granted.
CLARK and HUBBS, JJ., dissent, with opinion.

APPEAL by the defendant, Mary Murphy, from a judgment
of the Supreme Court, entered in the office of the clerk of
the county of Cayuga on the 26th day of April, 1919, convicting
her of the crime of murder in the second degree.

*Frederick A. Mohr*, for the appellant.

*Benn Kenyon, District Attorney*, for the respondent.

KRUSE, P. J.:

The facts have been quite fully stated in the opinion of
Mr. Justice CLARK, but I think a little more should be said
about the mental condition of Michael Murphy, whom the
defendant has been convicted of murdering. While the evi-
dence shows that he came to his death by strangulation,
and that Mary Murphy, the defendant, may have caused
his death, I think it is at least as probable that he committed
suicide. The evidence shows beyond question that he was
afflicted with senile dementia and of suicidal tendency.

For a time he had been an inmate of St. Ann's Home, an
institution in the city of Rochester, and had become so unman-
ageable that on the 20th of June, 1916, he was committed to
the State hospital for the insane in that city. One of the
medical examiners who made the certificate upon which he

was committed testified upon the trial that he had delusions of persecution; that there was poison in his food; he refused to eat; had religious delusions and threatened to commit suicide. His testimony is corroborated by the certificate of the two physicians who made the examination and the facts stated in the petition upon which he was committed.

One of the physicians at the hospital testified that his case was diagnosed as one of senile insanity; that he had paranoid ideas and wanted to die, and was considered very suicidal while he was in the hospital, so much so that he was confined all the time in the section where patients of the old, senile, arterio sclerotic types, particularly if they showed suicidal tendency, were confined; that while he never attempted to commit suicide, that was because he never had an opportunity, and that in the senile type there is no chance of permanent recovery, although his condition was so far improved that after six months he was paroled to the care of his brother Dennis and permitted to leave, but against the advice of the management of the hospital and upon the express responsibility of the person to whose care he was committed, the superintendent requiring the brother to sign a written agreement to that effect, as was usual in such cases.

From the 20th of November, 1916, the date of his parole, up to the time of his death on the 21st of May, 1918, he lived with his brother Dennis, who testifies that some days he would be all right and other days he could not do anything with him, and gave specific instances of abnormal acts, such as getting on a chair with his beads around his legs and making a grab and saying: " There comes the devil." That he used to pray outdoors any place where he was sitting and talk to himself and rub his hands until they would draw blood.

The learned district attorney contends that the strangulation was not by suspension, but by drawing the wire through the loop tightly around the neck. That may be so, but if Michael intended to commit suicide he could draw the wire together himself and accomplish self destruction. While he was somewhat feeble and blind, he had sufficient strength to do the act. It is true that both Dennis and his wife stated that he hung himself, calling attention to a particular rail and to marks on the rail which indicated to them had been made

by the wire, but neither claims to have seen him suspended. Each of them testifies that Michael was lying under the stack of rails with the wire around his neck.

If the defendant committed the crime and wanted to make it appear that Michael had hung himself it would not have been difficult for her to have hung up the body after she had strangled him. The defendant's conduct immediately after the tragedy is consistent with innocence rather than guilt. Even if we disregard her testimony about calling her husband, concededly she went to the road immediately after the tragedy and told Toomey about it. While she and Toomey, an adverse witness, do not agree upon just what was said, there is nothing to indicate that she was attempting to conceal anything. Toomey says she wanted him to come and see old Mike; that he replied he would have nothing to do with old Mike; that she said, " Old Mike is dead and it's a good thing," and he replied, " It may be good for you." Both she and her husband willingly gave information, made statements and voluntarily gave testimony before the coroner. So far as I have been able to discover there is nothing to indicate that there was the least concealment upon their part.

If the defendant wanted to kill this old man it is hard to believe that she would put a wire around his neck, strangle him to death, carry his body and put it under the rails, and do all this in broad daylight within the view of her neighbors or any one passing along the road. It is said that Michael's happy frame of mind in the morning before he was strangled indicated that he was not contemplating suicide.

An expert witness, whose business was that of a micro-chemical investigator, as he said, gave evidence of the condition of the body, of the rails, of the ground, and of the general surroundings, and also made an examination of the contents of Michael's stomach eight days after his death for the purpose, as it was claimed by the prosecution, to show the mental condition of Michael just before he was strangled. It is unnecessary to relate the various opinions the witness expressed; they cover a wide range. I think very little of the testimony of the witness serves any useful purpose, and some, I think, was improper and may have done harm. The contents of the stomach, according to the testimony of this

Fourth Department, July, 1920.            [Vol. 193.

expert, consisted of eight fluid ounces of semi-solid food, remains of cooked egg and potatoes and some fatty liquids, all in a semi-digested condition. Just what inference the jury was to draw from this is not clear. If it was intended to show that just before his death Michael was in a happy, contented state of mind it falls far short of establishing that he did not commit suicide.

Dr. Walker, a physician connected with the Rochester State Hospital, interrogated upon that subject, testifies that the mere fact that the patient shows apparent cheerfulness does not indicate that a suicidal plan is not present; that he had had patients under his care apparently looking very happy, and within an hour they would make a bad attempt at suicide, and that the mere fact that a patient had eaten a hearty meal carried with it no presumption that within a short time he would not attempt to commit suicide, or was not possessed of suicidal mania. He further testified that their efforts to commit suicide are sometimes extremely ingenious and that he would not infer from the mere fact that there is physical improvement over a period of months or years in a person affected with senile insanity, that the fits of recurring suicidal impulse are removed.

It is said that the defendant was harsh and cruel to Michael; that she scolded him and struck him. I have no doubt she used language that seems harsh, but it should be remembered that these people were uncultured and unaccustomed to polite society. There is no doubt that the defendant is boisterous and unrefined. As for striking him, the only evidence, aside from what she herself seems to have said boastingly, is that upon one occasion she struck his hat from his head; he picked it up and she repeated it. I think many incidents disclosed by the evidence have been given undue importance as tending to prove this crime. I call attention to but one as typical of others.

The witness Jennie Smith testifies that in the fall of 1917 she saw the defendant breaking sprouts from the branch of a tree; that she asked the defendant whether she was going to whip a carpet; that the defendant replied no; that she had been giving the old man a whipping, and when she whipped him he calls for mercy, and that when he did she gave him

some more.  The witness says she thought she might be joking, but the expression of her face was rather stern; that at first she thought perhaps the defendant might be telling it for the benefit of the neighbors because she was a great woman to talk.  She was asked whether she thought she really meant it; she said she did not know, and finally says that she was not so sure that she did not mean it.

While the defendant seems to have been a garrulous, ignorant woman, there is nothing, up to the time of this accusation, to indicate that she was criminally inclined.  She had been married twice, had had twelve children, and evidently worked hard, both in her house and outdoors.  Witnesses were called upon the question of her general character, who stated that her reputation was good.  Others were called for the prosecution, who stated it was bad, but upon cross-examination it developed that their opinion was founded largely upon the accusation of which she was on trial and upon what people had stated who were unfriendly to her.

I have no doubt that her conviction was largely brought about by denying what she had said to others and contradicting former statements made by her.  If she had been as frank as her husband in her testimony the result might have been different.  But merely because she may have made misstatements and been lacking in frankness, should not convict her of this crime.

While the charge of the learned trial judge was eminently fair and clear, I think the evidence is lacking in probative force to establish the defendant's guilt.  The jury was instructed, in substance, that the evidence must exclude, to moral certainty, the hypothesis that the deceased committed suicide. I think the evidence is quite to the contrary.  The judgment of conviction should be reversed upon the law and the facts and a new trial ordered.

All concur, except HUBBS and CLARK, JJ., who dissent in an opinion by CLARK, J.

CLARK, J. (dissenting):

The defendant was indicted by the grand jury of Cayuga county charged with the crime of murder in the first degree.

After a protracted trial she was convicted of murder in the second degree, and she appeals from that conviction, and as stated by her counsel in his brief, " relies on this appeal upon the failure of the proof to establish either the commission of a crime or to connect the defendant with any alleged crime."

The deceased, Michael Murphy, was an aged man, stated by different witnesses to be from sixty-seven to seventy-seven years old at the time of his death.   He died from strangulation between seven and eight o'clock on the morning of May 21, 1918, at the town of Niles, Cayuga county.

It is the theory of the People that defendant strangled him with a baled hay wire.   Defendant's theory is that deceased committed suicide by hanging himself with the wire.   He was at the time of his death, and had been for some time, almost blind.   He could distinguish light from darkness, but could not distinguish objects.   In going to the water-closet, fifty to sixty feet in the rear of the house where he resided with defendant and her husband, Dennis Murphy, the latter being his younger brother, he guided himself by taking hold of a wire that had been strung between the rear portion of the house and the closet, and as he would walk around the premises he felt his way with a cane.

Michael had a good appetite, and at the time of his death, although feeble from advanced age, was of a cheerful disposition, and the last time he was seen alive he was singing or humming to himself.

In 1917 deceased deeded to his brother, defendant's husband, the farm of some sixty odd acres on which they all resided at the time of his death.   In making that conveyance he reserved to himself a life lease of the property.   Some time previously he had conveyed his property to his local pastor, but it had been returned to him before he deeded it to his brother Dennis, and this pastor had agreed to pay defendant and her husband five dollars per week for Michael's board and care.   These payments had not been kept up regularly, and were considerably in arrears, and had been the occasion of much fault finding on the part of defendant.

At the time of the tragedy Mrs. Murphy was a large woman weighing 180 pounds, strong and powerful, and forty-seven years of age.

The jury were justified in finding from the evidence that defendant was much stronger, both physically and mentally, than deceased, and that she was not afraid of him; that the presence of Michael in her home was distasteful to her; that she had thrown water in his face at night because he snored; that she told a neighbor the morning he died, " Mike is dead and it is a good thing; " that shortly before this statement was made this neighbor, who lived about 775 feet from the Murphy house and in plain sight of it, saw Michael sitting in a chair on a side veranda and defendant standing near him talking in a loud voice; that at one time when Michael was in the kitchen and a meal was ready he got up and started toward the table and defendant told him to go back in the corner and stay there until she called him up; that in the fall of 1917 defendant was seen with a whip or switch in her hand and told a neighbor she had been " whipping the old man and when he held up his hands and cried mercy, mercy, I gave him more; " that she told another neighbor that he kept her awake nights, and she got up and threw a dipper of water on him, and said she could not get along with him; that on another occasion in the spring of 1917 she told another neighbor who heard loud talking at the Murphy place that she could hardly get along with him, and that they were back nearly a year with his board; that she called him a good for nothing old pup, and that he was not fit to live with the hogs; and on another occasion a neighbor saw defendant strike at Michael's head and his hat fell off; he picked it up and she struck at him again and his hat fell off again; and on another occasion in 1917 defendant called him to dinner, saying: " Come in to your dinner you old devil, who wants to eat with you." After Michael's death she was asked if she was going in to see the corpse and she replied, " No, I have seen enough of the old devil this morning."

There was much other direct evidence of a similar nature given on the trial by various witnesses, but this is sufficient to show, if it was believed, the extreme unfriendliness of defendant towards Michael Murphy.

Defendant denied practically all, if not all, of these statements, but the evidence was given by various witnesses and the jury had a right to credit what they said, and if it was believed by the jury it must have gone a long way in establish-

Fourth Department, July, 1920.          [Vol. 193.

ing a motive for defendant's wanting to get rid of Michael, and the burden of having him around and caring for him.

On the morning of May 21, 1918, the family at the Murphy house consisted of defendant, her husband Dennis and the deceased. Dennis got up about five o'clock, but Michael had preceded him. Defendant was the last of the three to arise. They had breakfast between six and seven o'clock, and Dennis went to the field to harrow, leaving defendant and Michael alone at the house. He was never seen alive after that by any one except defendant and a neighbor, Mr. Toomey, who saw him sitting on a side porch and defendant standing near him and talking in a loud voice. Shortly after seven o'clock this man Toomey was driving past the Murphy house and testified that defendant came out and called to him to come in saying, " Mike is dead and it is a good thing." Defendant denied this statement. Toomey did not stop, and all we know of the transaction after that comes from defendant and her husband.

The dead body of deceased was found about seven-thirty o'clock that morning near a tree in the rear of the house, the head and trunk under sort of a wigwam-shaped coop formed by some rails standing against the tree. A baled hay wire which had been spliced and formed into a slip-noose was around his neck and drawn so tightly that the skin was discolored, and it was removed by Dennis with difficulty. There was a bruise on the side of his left cheek which it was shown could have been caused by a blow that might have rendered him unconscious. Aside from that and the mark on the neck going nearly around the neck caused by the wire, there were no serious marks on the body, although there were some superficial marks on the legs. There was no evidence of any struggle whatever.

No witnesses testified to seeing Michael strangled, but the People undertake to connect defendant with it by circumstances which it is claimed point clearly and conclusively to her guilt.

Defendant took the stand in her own behalf, and also made two different statements in writing, under oath, which were received in evidence, and they speak for themselves. In one, Exhibit 20, she stated that shortly after her husband left for the field " deponent went out to go to the toilet; deponent

then saw Mike standing near the tree where the rails are. He was putting his hands up feeling around; he had a small piece of wire about a foot long playing with it; saw him put it up back of his neck; that was before I went to the toilet; was in toilet a few minutes and when I came out he was standing, and I saw him put this wire up to his head and that scared me and I ran up to where Dennis was in the lot; when I came back I went as far as the corner of the toilet and it was then I saw the old man on the ground; he was under the rails. I could not see his body only his whiskers and the wind was moving them back and forth. I then called Dennis to come over. Before I went up to Dennis and before I called to him I saw Cornelius Toomey who was going by with milk, and asked him to ask Dennis to come down quick. *That was before I knew the old man was dead.*"

It will be recalled that Mr. Toomey testified that when defendant came out and spoke to him she said that Mike was dead and " It is a good thing."

This statement was made, signed and sworn to by defendant May twenty-fourth, three days after the alleged homicide. Later the same day she made another statement in writing and under oath in which she said that she was " in the house and heard Mike holler. Came out when I heard him. Came out of the kitchen door, south side. I just saw his white whiskers under the tree. I hurried to the house, did not go to him because I was scared to death. He was not sick, never had any spells. Did not see the wire, just saw his white whiskers and hurried to the house. I did not go out, my husband did. I saw the wire after they fetched him in. I saw the wire on the tree I guess, but could not tell you. Could not say whether there was a wire attached to the end of the rail or not. He seemed to be jolly, was humming to himself and started from the house singing. About 7:30 I discovered him."

On the trial she testified that the reason she did not go to him when she saw him fooling with the wire was because her constitution would not stand it, although she had been warned, as she stated, that he would be apt to commit suicide by using a wire.

Defendant's husband corroborated her about her coming to the field and reporting that Michael was handling a wire, but

Fourth Department, July, 1920.            [Vol. 193.

he told her he was only fooling, but after she returned to the house and called him he went and found Michael lying under the pile of rails stacked around the tree with a wire around his neck.

There was an ash rail running transversely through the crotch of the tree, and defendant's theory is that this old gentleman fixed the wire around his neck, attached it to this transverse rail and hung himself.

No one saw him hanging. He was on the ground when first discovered and apparently dead. The rail was produced on the argument, and it had some marks on it, but it was plain from the character of the wood, very hard and dry, that the marks could not have been made by the wire slipping off the moment any weight was attached to it, and the jury was justified in finding from the quality of the exhibit itself that the wire could not have made the marks as they appeared on the rail, and besides that there was evidence of witnesses to that effect. The entire surroundings as established by the evidence justified a finding that although deceased came to his death by strangulation, it was not by suspension.

The body was partly under this wigwam structure formed by the rails standing against the tree. The opening into this wigwam precluded the possibility of the body falling in there in the position in which it was found if the strangulation had been caused by suspension.

A witness was examined as to this opening and testified as follows: " Q. Did you make a measurement to determine the height of the obstruction under which this body would have to pass to go under the rail? A. Yes, sir. Q. What was it? A. Two feet and six inches."

In order to have gotten into the position where Dennis testified he found the body, it must have crumpled up low enough to go under the two-foot six-inch obstruction, and then go through the opening into the wigwam three feet and six inches.

When we consider that if the strangulation was caused by suspension all this would have to be accomplished after the wire slipped off the rail and the man was dead it would seem that it was a physical impossibility. There was no evidence of a struggle, and the conclusion is irresistible that the only

way the body got into the wigwam in the position where Dennis claims to have found it was that it was placed there after Michael had been strangled, or been made unconscious by a blow.

Moreover, the wire itself as found by Dennis shows that it was adjusted so that the noose was at the back of the head. The wire consisted of two pieces spliced in the middle with a loop three-quarters of an inch wide where it was wrapped around the main wire.

It is difficult to see how such a wire could remain in that condition suspending a body weighing at least 150 pounds, and it is incredible that such a contrivance could have been fixed in that way and adjusted to a rail by a blind, old man.

When the coroner was at the Murphy place the afternoon of the tragedy Dennis produced the wire, saying, "This is what he done it with," and said, "It looks as though it broke." The coroner testified that he asked where the other piece was, and Dennis said, "It must have slipped."

How did he know? Why the voluntary statement in producing the wire, "This is what he done it with?" The loop in the wire was in the back of the neck only one-half inch off the median line. How could a feeble old man, practically blind, get his arms in position to adjust the wire like that and fasten it to a rail?

All these facts were before the jury and justified the finding that the body had not been strangled by suspension.

To justify defendant's contention that Michael committed suicide, it was shown that in 1916 he had been confined in St. Ann's Home, Rochester, put there by his pastor, who had handled his property for a time, and that for five months, from June 20 to November 18, 1916, he had been confined in the Rochester State Hospital, and was insane, and that he had suicidal tendencies.

The only evidence that I can find in the record that he ever tried to commit suicide in Rochester was when one witness testified that he tried to jump out of the window of his room at the St. Ann's Home, but when it was subsequently developed from this witness that the window was only between three and four feet from the ground, the idea that he was about to get out of his window with suicidal intent vanishes. The old

Fourth Department, July, 1920. [Vol. 193.

gentleman was simply sick of staying at this home and under-took to step out (not jump out) to go home. The conclusive way in which that theory of suicide was disposed of may well have had its effect on the jury as to the good faith of the entire program of endeavoring to fix on this blind, old man who wanted to go home the stigma of having a suicidal tendency.

Even if he did show suicidal tendencies in Rochester in 1916, his subsequent life was such as to render improbable the idea that they entered into his thoughts and actions up to the time of his death.

All witnesses who saw him shortly prior to his death agree, and even the defendant herself, that he had been in good health, was cheerful, and only that morning the last time defendant saw him he was humming and singing. Such actions are hardly consistent with a suicidal intent.

While the evidence is circumstantial, the circumstances were established largely by direct proof, and it was the province of the jury to consider them, and the finding that they pointed clearly to the guilt of defendant and seemed to be inconsistent with her innocence, was perfectly justifiable.

Defendant had the opportunity, for she and deceased were alone just prior to his death. She had the motive to get rid of him. Her husband had title to the farm where they lived, but Michael had the life use of it. If he was out of the way the title in the husband would not be burdened with this life estate. The board bill that was to be paid on his account was largely in arrears, and that annoyed defendant. Michael was old and a great care. She did not like him as is evidenced by her treatment of him, calling him hard names, throwing water on him while he slept, striking him, telling him he was not fit to live with the hogs, all of which was testified to on the trial, and which the jury had a right to believe, and finally defend-ant's statement that if she had got to go to prison she would squeal and Dennis would go too, her indifference when she saw Michael with the wire, having been warned that he would take his life by the use of such an instrument, and still not going near him to advise or restrain him, all these facts and circumstances were before the jury, and they were in a position to observe the many sidelights of this protracted trial, and after listening to a full and comprehensive charge from the

learned trial court that the defendant at least could not properly criticise, the jury has stated that defendant was guilty of murder in the second degree. I think the verdict was warranted by the evidence, and under it a verdict of guilty of the crime charged in the indictment would have been justifiable.

The case of *People* v. *Galbo* (218 N. Y. 283), cited and relied upon by defendant, is not controlling here. The facts are different from the facts in the case at bar. In the *Galbo* case there was not one particle of evidence to connect defendant with the deceased the day of the murder, or with the transaction until after it occurred. Defendant was seen driving on a highway going east from Rochester early in the morning with a barrel in his wagon covered with canvas. Subsequently the same morning he was seen returning to Rochester without the barrel. Down a ravine near the road defendant had passed over, the body of deceased was found later the same morning in a barrel, with a piece of blood-stained canvas or burlap lying near it, and that burlap corresponded with a similar article found in a store conducted by defendant and his brother. The head and legs of deceased had been cut off by a skillful operator. Defendant was a cripple, a legless cripple, and deceased was a strong, robust man. There had evidently been a fierce struggle, for there were more than twenty wounds and bruises on the body of deceased. Not a scratch or blood stain were found on defendant. He had not been seen with deceased on the day he disappeared. There was no evidence whatever that defendant was even present when the murder was committed. The most the jury could have properly found was that defendant had undertaken to dispose of the body after the murder, but that was not evidence to connect him with the tragedy itself, and the most that could be spelled out of the evidence was that defendant was an accessory after the fact in trying to secrete the body.

In the instant case defendant was with deceased just before he died, and the only person so far as disclosed by the evidence who had the opportunity to kill him. He was an old and feeble man, almost totally blind, and on that account incapable of defending himself. Defendant was forty-seven years of age, strong and healthy, and weighed 180 pounds. She disliked the old man. She had the motive, the inclination and the oppor-

tunity to get rid of him.   Not one of these features existed in the *Galbo* case.

The other cases cited by defendant do not assist her, for the facts do not correspond with the facts here.   In the case of *People* v. *Ledwon* (153 N. Y. 10) the evidence for the People was furnished largely by a small boy.   His statements were very contradictory, he having testified different ways on the question of whether the deceased committed suicide or whether he was choked to death by defendant.   A new trial was granted largely because of these contradictions.

The case of *People* v. *Bennett* (49 N. Y. 137) was reversed because of an error in the charge.   In the case of *People* v. *Razezicz* (206 N. Y. 249) the conviction was reversed because the circumstances were based, not upon direct proof, but by inferences based on inferences, while in *People* v. *Giordano* (213 N. Y. 575), where defendant was charged with murdering his wife, no motive was established, as it appeared that defendant and his wife were friendly, and there was no proof that he owned the instrument with which the murder was committed.

In the case at bar many of the facts and circumstances were established by direct proof — particularly the evidence of ill feeling which defendant had for deceased; her contradictory statements about the affair; her statement that if she had to go to prison she would not go alone, but would squeal and her husband would go with her; her peculiar actions when she discovered the old man trying as she said to fix a wire back of his head before she went to the field to notify her husband, although she had been previously warned that Michael would take his life with a wire, and knowing all that she did not raise a hand or do a thing to prevent it, and then telling a neighbor that morning that " Mike is dead and it is a good thing," and her frequent ill treatment of him.   The jury heard all of this evidence, and much more, that was given by the witnesses.   It was direct evidence to establish facts and circumstances which the jury would consider and weigh.

The jury had a right to pass on the facts, and so long as the trial was fair, and every right of the defendant was safeguarded, and where the verdict is supported by sufficient competent evidence, the appellate court should not interfere.

Where a crime is sought to be established by circumstantial

evidence, the circumstances must be established by direct proof, and not be left to inferences merely.

The circumstances here were almost all established by direct proof, either by witnesses who heard various statements of defendant, or heard and saw what she had done to the deceased at different times, and by her sworn statements admitted in evidence.

While it is true that in cases where a crime is sought to be established by circumstantial evidence, every link in the chain of circumstances must be connected so that the guilt of the accused flows naturally from the facts and circumstances proved, and while they must point clearly to the guilt of defendant, and be inconsistent with her innocence so that her guilt must be established to a moral certainty, I think the facts and circumstances proved in this case have fully measured up to this rigid standard, and point clearly to defendant's guilt.

As was said by Judge HISCOCK in *People* v. *Gillette* (191 N. Y. 107): " But all taken together and considered as a connected whole, they [the circumstances] make such convincing proof of guilt that we are not able to escape from its force by any justifiable process of reasoning, and we are compelled to say that not only is the verdict not opposed to the weight of evidence and to the proper inferences to be drawn from it, but that it is abundantly justified thereby."

The evidence in this case has been read with the utmost care and after due consideration the impression is left that no mistake was made by the trial jury, that the facts and circumstances as established point clearly to defendant's guilt and exclude every hypothesis of her innocence.

Defendant asks that this conviction be reversed because, as it is claimed, instructions were given to the jury in the absence of the defendant. The record is silent in that regard so the question is not properly here, but on the argument the point was raised by counsel for defendant. He was asked by a member of the court if the prisoner was not finally sent for, and on her appearance if the court did not withdraw what had been said in her absence, and if the court did not reinstruct the jury on the points raised in her presence, and he replied in the affirmative. That being so, no right of defendant was overlooked and no injustice was done her.

The case of *Maurer* v. *People* (43 N. Y. 1) does not assist defendant. That was a case where the jury came in for instructions, received them and retired, all in the absence of defendant. Here whatever was said to the jury in response to the request for additional instructions in the absence of defendant was withdrawn when her absence was discovered and the jury told to disregard it and then the jury was reinstructed on the same points. If any error had unwittingly crept into the proceedings it was cured and no injustice was done defendant. (*People* v. *Thorn*, 156 N. Y. 286; *People* v. *Kelly*, 94 id. 526.)

Defendant had a fair trial, no legal error was committed that would justify a reversal, the verdict of the jury was right and based on sufficient evidence, and the judgment of conviction and order denying the motion for a new trial should be affirmed.

HUBBS, J., concurs.

Judgment of conviction and order reversed and new trial granted upon the grounds stated in the opinion, and that the verdict is contrary to law and clearly against the evidence, particularly the finding of the jury that the defendant caused the death of Michael Murphy.