## GROUF v. STATE NAT. BANK OF ST. LOUIS.

### No. 8679.

Circuit Court of Appeals, Eighth Circuit. March 20, 1930.

Samuel R. Wachtell, of New York City (Rassieur & Goodwin and John P. McCammon, Jr., all of St. Louis, Mo., on the brief), for appellant.

Marion C. Early, of St. Louis, Mo., for appellee.

Before STONE and BOOTH, Circuit Judges, and REEVES, District Judge.

BOOTH, Circuit Judge.

This action at law was brought by appellant against appellee,.the petition containing ten counts. In the first count recovery was sought upon a letter of credit issued by appellee, on the faith of which nine drafts were purchased and cashed by the Anglo-Austrian Bank located in Vienna, Austria. In the other nine counts recovery was sought upon the individual drafts.

The Anglo-Austrian Bank subsequently changed its name to Anglo-Austrian Bank, Limited, and prior to the commencement of the action assigned its cause of action to appellant.

The amount claimed was $9,450 with interest from July 14, 1919.

Among the defenses set up were the statute of limitations of the state of Missouri, and payment of the drafts to the Anglo-Austrian Bank by Francis L. Stuever and Celia M. Stuever, who had drawn and negotiated the drafts in accordance with the terms of the letter of credit.

A jury was waived by stipulation in writing duly filed, and the case was tried to the court, resulting in a judgment in favor of appellant in the sum of $1,350 with interest from July 14, 1919. The present appeal followed.

From admissions in the pleadings and from the findings of fact filed, the following facts appear, which are either undisputed or sustained by substantial evidence: Francis L. Stuever and Celia M. Stuever were American citizens who resided in Vienna, Austria, from sometime prior to 1915 until 1928. At the request of the Stuevers the appellee on August 13, 1915, issued to the Anglo-Austrian Bank the following letter of credit:

"The State National Bank of St. Louis

"United States Depositary

"St. Louis, Mo. August 13, 1915.
"Anglo-Austrian Bank, Vienna, Austria.

"Gentlemen:—We beg to request that you kindly cash drafts drawn on us by Celia M. Stuever or Francis L. Stuever, from time to time as same may be presented, up to a total amount of Ten Thousand Dollars ($10,000.-00). We engage that same shall receive due honor, and we shall be glad to remit in reimbursement as you may direct. This authority to be in force for one year from August 12, 1915, or until otherwise advised by us.

"Thanking you in advance for your courtesy, we are

"Yours respectfully,
"[Signature] H. L. Stadler, Cashier."

Upon the faith of and pursuant to said letter of credit the Anglo-Austrian Bank

cashed and purchased drafts drawn by the Stuevers as follows:

To Francis L. Stuever, February 1, 1916, .......................... $100.00
To Celia M. Stuever, March 10, 1916, 400.00
To Celia M. Stuever, March 13, 1916, 400.00
To Celia M. Stuever, March 17, 1916, 400.00
To Celia M. Stuever, March 24, 1916, 400.00
To Celia M. Stuever, March 29, 1916, 400.00
To Francis L. Stuever, April 7, 1916, 100.00
To Celia M. Stuever, April 26, 1916, 3,100.00
To Francis L. Stuever, April 28, 1916, 4,150.00

$9,450.00

At the time said drafts, and each of them, were cashed and purchased by the Anglo-Austrian Bank from the Stuevers, a state of war existed between the Austro-Hungarian government and its allies on the one hand and the governments of Great Britain and its allies on the other hand. At said time the government of Great Britain had declared and was enforcing a blockade by reason of which the Anglo-Austrian Bank was prevented from transmitting said drafts, so purchased, to the United States for collection.

The government of the United States of America declared war against the government of the Austro-Hungarian Empire on the 7th day of December, 1917, and said war continued until, and was concluded by, the ratification of a treaty of peace, on the 8th day of November, 1921.

"A short time prior to December 17, 1916, the Anglo-Austrian Bank requested Dr. Stuever to personally reimburse it for the $9,450.00 drawn by him and his sister. He undertook to do so, and procured a remittance from the Equitable Trust Company of New York, through the Vienna Bank Union, of the sum of 69,528 Kronen, then worth $8,100.00. This money was received by the Anglo-Austrian Bank, and both this money and the drafts drawn by the Stuevers and aggregating the said sum of $9,450.00 were retained by said bank. The bank, while holding this money, refused to apply it on the payment of the drafts, for the sole reason that it deemed itself payable in dollars and not in Kronen, and inferentially would have then suffered a small loss by so doing. The bank insisted on holding this money in a savings account, but the Stuevers refused to agree and insisted that the money be applied on the drafts. In March, 1923, the said bank forwarded a savings account book to the Stuevers, without any authority for such act. At the time this book was sent the 69,528 Kronen were worth less than 30 cents." [Finding No. VII.]

The State National Bank of St. Louis gave notice to the Anglo-Austrian Bank by letter under date of July 14, 1919, that the drafts hereinbefore enumerated would be dishonored, and by giving such notice waived demand on said drafts and did dishonor said drafts,—said letter being as follows:

"The State National Bank of St. Louis
"St. Louis, Mo. July 14, 1919.

"The Anglo-Austrian Bank, Vienna, Austria.

"Gentlemen:—We are just in receipt of your letters of January 10th, 1917, February 1st, 1917, and May 30th, 1919, all in the one enclosure.

"On December 4th, 1916, at the request of Dr. Stuever, through Cornet & Zeibig, of this city, we had $8,100.00 (Kronen 69528) sent you by wireless through the Deutsche Bank of Berlin, in payment of the drafts referred to in your aforesaid letters. We have been advised that while you received such remittance you nevertheless refused to apply it as payment of the drafts, or to pay it over to Dr. Stuever on his demand therefor. As you are still with the funds, remitted for the payment of these drafts, Dr. Stuever has instructed us, also through Cornet & Zeibig, to decline payment of them until the matter may be settled between yourselves. Should the drafts meanwhile be presented to us for payment, we will be obliged to refuse as we cannot but believe that your retention of our remittance justifies Dr. Stuever's present instructions.

"In any event, we do not understand that the drafts call for interest or that your delay, or indeed any delay, in their presentation should obligate us to pay any.

"Yours very truly,
"[Signed]   H. L. Stadler, Cashier."

The drafts hereinbefore enumerated remained unpaid at the date this action was instituted.

On the 25th day of April, 1925, the Anglo-Austrian Bank, Limited, the successor to the Anglo-Austrian Bank, and the owner and holder of the drafts hereinbefore enumerated, duly assigned, sold, transferred, and set over unto Meyer Grouf, appellant herein, all claims and causes of action, of every nature whatsoever, which it had against the State National Bank of St. Louis, Mo., appellee herein, under and by virtue of said letter of credit.

The court also included in its findings of fact the following: "The sum of 69,528 Kronen received by the Anglo-Austrian Bank was at the time of such receipt the equivalent of

$8100.00 and was not payment in full of the drafts aggregating $9450.00 in suit, and did not discharge defendant's full liability on said drafts, but only pro tanto."

The first part of this finding is supported by the evidence; the latter part—that the kronen "did not discharge defendant's full liability on said drafts, but only pro tanto" —we think is more properly a conclusion of law, and to be considered with the conclusion relative to estoppel.

Among other conclusions of law the court held that the cause of action was not barred by the statute of limitations; that under the facts found the Anglo-Austrian Bank was not bound to present the drafts prior to July 14, 1919, and that the period of the duration of the war between the United States and Austria-Hungary was deductible from the time that elapsed between the accrual of the cause of action and the filing of the action; that defendant breached its acceptance of the drafts by its letter of July 14, 1919, and thereby became liable for interest from that date; that the drafts in evidence being dollar drafts could be satisfied by dollar payments only, and that the transfer of 69,528 kronen to the Anglo-Austrian Bank at the instance of the Stuevers did not operate as payment or discharge of said drafts, per se; but that both the prior and subsequent acts and conduct of the Anglo-Austrian Bank estopped it to deny satisfaction pro tanto; and that plaintiff was entitled to judgment in the sum of $1,350 with interest from July 14, 1919, to the date of the judgment.

Upon this appeal the finding designated VII is attacked as being without support in the evidence.

We have examined the record with care and we find a sharp conflict in the evidence relative to the facts covered by this finding. The evidence on behalf of the appellant tended to show that, because of difficulty of communication on the part of the Anglo-Austrian Bank, and because the Stuevers could communicate with America through diplomatic agencies, the bank requested them to communicate with and arrange for appellee to pay these drafts in dollars, and that when the kronen were received in December, 1916, the bank refused to accept such as payment, demanding payment in dollars; and that the kronen were held in a savings account for the Stuevers with their consent until disposition thereof should be ordered by the Equitable Trust Company, which had sent them for the purpose of paying the drafts.

The testimony for appellee is that the Stuevers had received payment on their drafts

in kronen, and arranged with the Anglo-Austrian Bank to repay in the same value of kronen the amount which they had received, which was 61,425 kronen; that the bank agreed that it would accept the payment in kronen; that the Stuevers had appellee purchase and transmit to the Anglo-Austrian Bank the value of kronen at that time, which was 69,528 kronen; that this was transmitted, in accordance with the agreement with the Anglo-Austrian Bank, in payment of the drafts; that after that bank received the kronen it refused to so apply them, refused to deliver the drafts, as paid, to the Stuevers, refused to pay over the kronen thus received, and deposited the kronen in a savings account against which the Stuevers could not draw—all against the consent and protest of the Stuevers; and that it so held the drafts and the kronen until the kronen had become worthless.

In view of this state of the evidence it cannot be said that the finding VII by the court is without any substantial support, and accordingly, under the familiar rule, it will not be disturbed.

Two other propositions are discussed by appellant: (1) That as soon as the Anglo-Austrian Bank cashed the drafts of the Stuevers on the faith of the letter of credit, and in compliance therewith, the obligation of the St. Louis bank to pay the drafts became absolute, and was not affected by any equities thereafter arising between the Anglo-Austrian Bank and the Stuevers; (2) that the facts found by the court in finding VII do not support the legal conclusion of an estoppel against the Anglo-Austrian Bank in favor of the appellee bank.

As to the letter of credit. Judge Story (Bills of Exchange [4th Ed.] § 459) has defined a letter of credit as "an open letter of request, whereby one person (usually a merchant or a banker) requests some other person or persons to advance moneys, or give credit, to a third person, named therein, for a certain amount, and promises that he will repay the same to the person advancing the same, or accept bills drawn upon himself, for the like amount."

The courts are not agreed as to the basis or theory upon which the writer of the letter is held liable to the addressee who has paid money to the beneficiary upon the faith of the letter of credit. See 32 Harvard Law Review, page 1.

But whatever the theory, the courts are agreed that such liability exists, and that the measure of such liability is to be found in the letter itself. Equities existing in fa-

vor of the beneficiary afford no defense to the issuer of the letter of credit against the addressee who has paid money to the beneficiary upon the faith of the letter of credit, and in accordance with its terms. American Steel Co. v. Irving Nat. Bank (C. C. A.) 266 F. 41; Bank of Taiwan v. Gorgas-Pierie Mfg. Co. (C. C. A.) 273 F. 660; Second Nat. Bank v. Columbia Tr. Co. (C. C. A.) 288 F. 17, 30 A. L. R. 1299; Old Colony Tr. Co. v. Lawyers' Tit. & Tr. Co. (C. C. A.) 297 F. 152; Bank of Taiwan v. Union Nat. Bank (C. C. A.) 1 F.(2d) 65; Laudisi v. American Ex. Nat. Bank, 239 N. Y. 234, 146 N. E. 347; Courteen Seed Co. v. Hong Kong, etc., Corp., 216 App. Div. 495, 215 N. Y. S. 525, affirmed 245 N. Y. 377, 157 N. E. 272, 56 A. L. R. 1186; Frey & Son, Inc. v. Sherburne Co., 193 App. Div. 849, 184 N. Y. S. 661; Lamborn v. Lake Shore B. & Tr. Co., 196 App. Div. 504, 188 N. Y. S. 162; 53 A. L. R. note, page 70.

In the Laudisi Case, supra, the court said (page 243 of 239 N. Y., 146 N. E. 347, 350): "The contract between the customer and the bank, under which the latter issues an irrevocable letter of credit, is entirely distinct and apart from the contract between such customer and, as in this case, his vendor under which goods are to be shipped. The question between the customer and the vendor is the one whether the goods comply with the contract, and if they do not the former has his appropriate right of action. The question between the customer and the bank which issues the letter of credit is whether the documents presented with the draft fulfill the specific requirements, and if they do, speaking of such facts as exist in this case, the bank has the right to pay the draft no matter what may be the defects in the goods which have been shipped. The bank is not obliged to assume the burdens of a controversy between the vendor and vendee and incur the responsibility of establishing as an excuse for not paying a draft that the vendee's version is the correct one."

In Frey & Son, Inc., v. Sherburne Co., supra, the court said (page 854 of 193 App. Div., 184 N. Y. S. 661, 664): "It would be a calamity to the business world * * * if for every breach of a contract between buyer and seller a party may come into a court of equity and enjoin payment on drafts drawn upon a letter of credit issued by a bank."

In the Old Colony Tr. Co. Case, supra, the court said (pages 155–156 of 297 F.): "It would be dangerous if bankers or bank-ing institutions who issue letters of credit were confronted with the problem of deciding anything more than whether or not the documents presented were the documents required under the letter of credit and whether the conditions in the letter of credit set forth were complied with. Behind a letter of credit of the kind here concerned are, of course, always the buyer and seller of the merchandise, and usually the buyer, as here, indemnifies the issuer of the letter. The banker is always in a position of sharp responsibility, and, if he honors a letter of credit contrary to its terms, he may invite troublesome litigation. Thus, it is to the interest of the merchant as well as the bank that it should not be made difficult to obtain letters of credit because of technical reasons, and hence that the issuance of such letters shall not be embarrassed by placing upon the issuing bank any responsibility to look beyond the documents required under the letter and the conditions, if any, with which under the letter there must be compliance."

Whether the rules above stated are broad enough to preclude the issuer of the letter of credit from relying upon the defense of payment to the addressee of the letter by the beneficiary, we need not determine. Although such a defense was set up in the case at bar, and evidence was introduced in support thereof, yet, the trial court has made no finding of payment by the beneficiary. On the contrary, there is a finding that the drafts remained unpaid at the date the action was commenced, and still remain unpaid at the date of the findings.

We think the trial court was right in finding that payment of the drafts had not been made.

The question of estoppel remains to be considered. The trial court, though finding that the drafts had not been paid, and that the transfer of the 69,528 kronen to the Anglo-Austrian Bank did not operate as payment or discharge of the drafts per se, yet held that the acts and conduct of the Anglo-Austrian Bank estopped it to deny satisfaction of the drafts pro tanto. The reasons for this conclusion are given by the trial court in a memorandum, in which he says: "But I have no trouble in reaching the conclusion that the Anglo-Austrian Bank, having by its plain conduct concluded not to look to The State National Bank, but to look to the Stuevers, and to personally arrange with the Stuevers that they should personally reimburse the Anglo-Austrian Bank, which the Stuevers undertook, as best they could, to do, that

the Anglo-Austrian Bank cannot pro tanto proceed against The State National Bank for the $8,100.00."

And again: "The other question was whether the Bank could claim the benefit of the $8100.00 sent to the Anglo-Austrian Bank by the Stuevers. I think nothing is clearer than they could. I can only add to what has been already said upon that subject, by saying that they chose, for their own purposes, to depart from their rights under the letter of credit, and to look to the Stuevers personally for that money. They got it, and they kept it. They kept it until it was lost. Clearly, then, they are estopped, and the Bank has the right, under the facts and circumstances to take advantage of that estoppel."

We are unable to agree with these views of the trial court. The necessary elements of an equitable estoppel are well established: "There must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied on or acted upon it to his prejudice." 21 C. J. p. 1119.

There is no finding that the Anglo-Austrian Bank, in looking to the Stuevers for reimbursement, released or agreed to release the appellee bank from its obligation to pay the drafts drawn pursuant to the letter of credit. It may be assumed that if payment of the drafts had actually been made by the Stuevers to the Anglo-Austrian Bank, the latter would not have pursued the appellee bank for payment. But payment was not made by the Stuevers to the Anglo-Austrian Bank. At most there was merely an attempt on the part of the Stuevers to make payment. There was no acceptance on the part of the Anglo-Austrian Bank. A dispute arose in regard to the medium of payment. The bank demanded dollars; the Stuevers offered kronen.

There was testimony tending to show that the Anglo-Austrian Bank agreed with the Stuevers to accept kronen in payment. There was evidence on behalf of the bank tending to show the contrary. The trial court has not found, either in its finding VII or elsewhere, that the Anglo-Austrian Bank did agree to accept kronen. In the absence of

such a finding it is difficult to see how the Anglo-Austrian Bank was estopped to deny payment, even as against the Stuevers, in view of the fact that the drafts were plainly payable in dollars.

The conduct of the Anglo-Austrian Bank in refusing to turn over the 69,528 kronen to the Stuevers, and in placing the kronen in a blocked savings account for the Stuevers against their protests, might give rise to a cause of action in favor of the Stuevers and against the bank for conversion; but this would not of itself amount to an estoppel to deny payment of the drafts, even in favor of the Stuevers.

As to the appellee bank it is to be noted that no estoppel was pleaded by it. Such a defense must be pleaded. Mabury v. Louisville & J. Ferry Co. (C. C. A.) 60 F. 645; Feick v. Stephens (C. C. A.) 250 F. 185; New York Life Ins. Co. v. Rees, 19 F.(2d) 781, 784 (C. C. A. 8). Furthermore, there was no estoppel shown by the findings, in its favor, for two reasons: First, because the findings were not sufficient to establish an estoppel in favor of the Stuevers; second, because there was no finding tending to show an estoppel in favor of the appellee apart from the findings claimed to support an estoppel in favor of the Stuevers. There is no finding that the Anglo-Austrian Bank had made representations to the appellee bank on which it had relied to its detriment, or even that the Anglo-Austrian Bank had communicated with the appellee bank. The trial court has found that the negotiations between the Anglo-Austrian Bank and the Stuevers, looking to payment, were a personal matter between them. The fact that the Stuevers procured funds from the appellee bank with which they undertook to make payment to the Anglo-Austrian Bank, does not establish an estoppel. There is no finding that the Stuevers communicated to the appellee bank the terms of their negotiations with the Anglo-Austrian Bank, or that the appellee bank knew the terms of such negotiations. The appellee bank in furnishing the funds was not acting in response to the letter of credit, but under instructions from the Stuevers. If by reason of those instructions the appellee bank has lost some of its funds, its recourse is against the Stuevers. The evidence shows that they are amply responsible.

We think that the trial court erred in its conclusion from the findings of fact that there was an estoppel in favor of either the appellee bank or the Stuevers as against the Anglo-

Austrian Bank to prevent the latter from denying payment in whole or in part of the drafts in suit.

We are asked by appellant to direct the tiral court to enter judgment in his favor for the full amount prayed. Even assuming that in a case of this character we have the power to make such order, yet, in view of the somewhat indefinite nature of the findings of fact and the possibility of additional evidence on a new trial, we have concluded that the case should be left open for further proceedings in the trial court. The judgment is accordingly reversed, and the cause remanded for a new trial.