PENTON v. STATE.

Crim. 4040

Opinion delivered September 27, 1937.

*George F. Edwardes, Jr.,* and *J. D. Cook, Jr.,* for appellant.

*Jack Holt,* Attorney General, and *John P. Streepey,* Assistant, for appellee.

GRIFFIN SMITH, C. J. The prosecuting attorney filed information in Miller circuit court, alleging that Foster Penton and Price Stephens "wilfully, feloniously and with malice aforethought, and after premeditation and with deliberation, did kill and murder Charley Block by striking and cutting the said Charley Block with an axe."

Appellant, on March 8, entered a plea of not guilty. He was granted a severance from Stephens. The jury returned a verdict of murder in the first degree and the court assessed the death penalty. On March 12 Stephens entered a plea of guilty to the crime of murder, and his punishment was fixed at life imprisonment in the penitentiary.

As grounds for reversal as to Penton it is urged (1) that improper remarks were made by the trial judge and prosecuting attorney; (2) that the court erred in refusing to instruct the jury that the defendant could not be convicted upon the uncorroborated testimony of witnesses who it was claimed were accomplices; (3) that the court refused to permit the defendant to exercise a challenge for cause upon a showing that one of the jurors had served upon a regular jury within one year; (4) that the court erred in admitting testimony by which the state sought to show that appellant and Stephens killed Block while engaged in the commission of robbery, whereas the information charged malice and premeditation; (5) that it was error to admit testimony of the sheriff and a deputy who told of appellant's confession; (6) that the court erred in commenting upon the weight of testimony; and (7) that Constitutional Amendment No. 22, authorizing prosecution by information filed by the prosecuting attorney in lieu of indictment by a grand jury, is invalid. Other errors are alleged, but

they are not of sufficient importance to require separate discussions.

(1) This assignment is predicated upon a question directed by the prosecuting attorney who asked a witness: "Did he (appellant) work for you at the time this murder happened?" In response to an objection the court remarked: "That's what it is." Attorneys for the defendant moved that a mistrial be declared, and were overruled. Thereupon the court, addressing the jury, said: "Well, gentlemen, it is a question for the jury as to whether or not it is murder."

Appellant's defense was not that he was justified in killing Block, but that he had no connection with the transaction, and was innocent. Therefore, use of the word "murder" by the trial judge could not prejudice appellant's cause. *Vasser v. State,* 75 Ark. 373, 87 S. W. 635.

(2) A complete answer to this objection is that neither of the witnesses who are alleged to have been accomplices testified to the guilt of appellant. The deceased's body was found in the river near Garland City. Tony Price testified: "I work for the Gas Company, and was going to look after the company's motor boats and skiffs. Upon reaching Block's house I said something, and there was no reply. Upon looking in the door I saw blood. I followed a trail of blood to the river bank and found a sweater I thought I recognized, but did not bother it. I bailed out the boats and then picked up Bill Barnum and told him what I had found and we went back and fished Charlie out of the river. This happened about the middle of December. When we got the body out of the river it looked badly cut and badly battered with some instrument. I could not say what time of day it was, but I go to work between 7:30 and 8:30. I do not remember whether I saw Charlie Block the day before, or not—I just don't remember."

It is contended that because the witness, after noticing the sweater and after having seen blood in the cabin and along the trail, went on bailing out his boat, and made no further investigation until he met Bill Bar-

num, an inference of guilt arises, and Price should be classed as an accomplice. But even if it should be admitted that the circumstances were sufficient to create a suspicion, it must be remembered that Price did not give any testimony connecting appellant with the crime, nor did he refer to appellant in any manner.

Price Stephens testified that he lived in Garland City and worked for Jesse Smith. At this point appellant's attorneys objected that the witness had been jointly accused with appellant, and that any testimony he gave would be self-incriminating. The court remarked: "He has not been asked any incriminating questions yet." Stephens was then asked whether he and appellant stood jointly charged with the robbery of Charlie Block, and he replied that he had entered a plea of guilty to that charge. This testimony was also objected to. When asked whether he was at Charlie Block's house "the afternoon of the night that you and Foster (appellant) robbed him," the objections were renewed. The court then asked the witness if he objected to giving testimony "about it," and the answer was, "Yes, I mind." Stephens was excused.

It is contended that the testimony given by Stephens conveyed to the jury information that appellant and witness had been jointly held for the robbery of Block; that they had entered pleas of guilty, and that such testimony probably formed a basis for the final verdict.

It will be noted that Stephens did not testify against appellant other than to say that they had been jointly charged with having robbed Block. He did not say that appellant participated in the robbery, or that appellant was present when it was committed, nor did he in any manner connect appellant with the transaction. In view of other testimony affirmatively fixing appellant's guilt, it will not be presumed that the jury was influenced by the references to robbery, and appellant did not suffer prejudice by reason of the testimony. It follows that the court did not err in refusing the requested instruction.

(3) Section 36 of Initiated Act No. 3, adopted November 3, 1936, repeals act 135 of 1931, which provided that "no citizen shall be eligible to serve on either a grand or petit jury oftener than one regular term of the circuit court every two years." The trial court was therefore correct in refusing to allow appellant's requested peremptory challenge.

(4-5) No testimony, other than the confession, was admitted to show that Block was killed by appellant with robbery as the objective, but it is insisted that the confession should have been excluded as having been induced through promise of reward. Sheriff Tom Sewell testified as follows: "I went with Mr. Greer, Mr. Adcock and Bill Smith down to investigate the killing of Charlie Block. We went to Charlie Block's house; found it open and a big pool of blood on the floor; found where the blood left the house and went off down the bank of the river; followed it about 600 yards to where the body was thrown into the river. Myself, with my deputies, examined the trail from the house to the point where the body was found, and beside the trail of blood discovered the tracks of two men. One of the tracks had three bars across the bottom of the shoes, and that track made a plain impression in the sand.

"I arrested appellant down there—carried him down the river to where those tracks were in the sand bar where they drug this body, and made him make a track there beside it. The shoes that he had on made, I think, the same track and the same size. I cut a stick and measured the track and the shoes he had on.

"I asked appellant what he thought about the tracks and if he didn't think the tracks looked very much like his, and he said yes, but he didn't make the tracks. So we went on down a piece further and coming back I showed him another track and he said that that was his track, but he couldn't tell exactly when the track was made. He denied at that time knowing anything about the murder of Charlie Block, but said he had been at Charlie Block's house that afternoon. I asked him if the clothes he had on were the same ones he had on the

evening he was at Charlie Block's house, and he said they were. I was present when a certain pair of pants was exhibited to appellant. He admitted that they were the pants he had on the afternoon before, and tried to explain how some blood was on them. There was blood on them. I don't know of my own knowledge where the pants come from. He said he had a disease and that it come on them from that. He, with some other suspects, was brought by myself and deputies to the Miller county jail. Appellant made a statement to me since he has been in custody.

"We had been talking to appellant a couple of days at different times about this thing, and he contended all the time that he knew nothing about it. Will Greer and myself rode up to the jail one day and appellant called out of the window for Mr. Greer to come up there; that he wanted to talk to him. Greer went up and got him and brought him down and he told how he killed Charlie Block and who was with him. I didn't call him down there. He said Tony Price was the man that killed Charlie Block. I told him that we were going to go down and get Tony Price and that he had better not lie because that would just get him in more trouble. He called us back and said he might have lied on Tony Price. Then he told me that he and Price Stephens killed Charlie Block, drug him down there and put him in the water. He said he had been there shooting craps that afternoon before Block was killed that night, and he knew Block had some money; that they fixed it up between themselves to go there and rob Charlie Block and get his money. Price Stephens went in to buy a dime drink of whiskey, and while he was standing there with the dime on the table that appellant took an axe and hit Block in the head two licks. Price Stephens took the money out of his pocket and handed it to appellant and when Stephens said that Block might not be dead he went back and picked up the axe and hit him two or three times more. Then they took the body and dumped it in the river, down where it was found. They dragged the body down there by his feet. I found

a dime lying there on the table by a fruit jar in Charlie Block's house, and found an axe lying there. Appellant told me it was his axe. After this statement had been made to me, Price Stephens was arrested.

"While appellant was in jail he stuck a match up his penis and caused himself to bleed and called us up there and showed us. I called Dr. Dale to check up and then I found the match he had used with blood on it. It was after that appellant made the statement to me and Mr. Greer.

"After the body had been recovered out of the river and the undertaker had dressed it, I looked at it and it was Charlie Block's body. There were four cut places on the body."

We are of the opinion that the confession was properly admitted. There is no evidence that appellant was in any manner mistreated. It is true that the sheriff says he carried appellant down to the river where there were tracks in the sand near Block's body, "and made him make a track there beside it." Appellant, however, does not insist that force was employed, or that he was threatened. The word "made" as used by the sheriff does not necessarily imply compulsion, and was doubtless used in a sense synonymous with "directed." Emphasis is placed upon testimony given by Deputy Sheriff Will Greer who says he told appellant it would go well with him if he told the truth. This was merely the expression of an opinion, and the statement was not coupled with innuendo or subtleties calculated to deceive the prisoner. Appellant was only advised to tell the truth.

It is suggested by counsel for appellant that Block might have met his death by a fall, or in some manner within the realm of speculation. However, there was no proof suggestive of any means other than violence, and the discovery of blood in deceased's cabin and a trail of blood leading to the river, considered in connection with the nature of the wounds, are substantial circumstances tending to confirm appellant's confession. Here, as in *Owens* v. *State*, 120, Ark. 568, 179 S. W. 1014,

"the *corpus delicti* was established by abundant testimony, and the confession constituted evidence legally sufficient to support the verdict."

(6) It is next urged that the court commented upon the weight of testimony. The remarks to which exceptions were taken were with respect to trivial matters, and could not have influenced the jury in arriving at a verdict. From a purely technical or legalistic standpoint, some of these comments might be classified as improper, and support for holding that they constituted reversible error can be found in the older decisions, written at a time when great weight attached to purely technical construction. But the tendency of present-day decisions is to regard as immaterial those matters which cannot conceivably militate to the prejudice of a defendant, where such construction does not, in the circumstances of the case, run counter to the law, nor conflict with rules of reason.

Initiated Act No. 3, referred to *supra,* will have the effect of simplifying procedure. Section 23, amending § 3029 of Crawford & Moses' Digest, cures the error complained of by appellant that prejudice resulted when the trial court permitted information to reach the jury that robbery motivated the murder, whereas malice and premeditation were charged in the information. The form approved by this section is as follows: "The grand jury of Pulaski county, in the name and by the authority of the state of Arkansas, accuses John Doe of the crime of murder in the first degree, committed as follows: The said John Doe, on January 1, 1936, in Pulaski county, did murder Richard Roe, against the peace and dignity of the state of Arkansas."

(7) Constitutional Amendment No. 22 was adopted at the general election in November, 1936. Section 1 reads as follows: "That all offenses heretofore required to be prosecuted by indictment may be prosecuted either by indictment by a grand jury or information filed by the prosecuting attorney." The resolution of the House of Representatives, under authority of which the amendment was submitted, provides that "if

a majority voting thereon at such election adopt such amendment, the same shall become a part of the Constitution of Arkansas."

A constitutional amendment is self-executing "if it supplies a sufficient rule by means of which the right given may be enjoyed and protected or the duties imposed may be enforced." *Jones* v. *Jarman*, 34 Ark. 323; *Griffin* v. *Rhoton*, 85 Ark. 89, 107 S. W. 380; *Arkansas Tax Commission* v. *Moore*, 103 Ark. 48, 145 S. W. 199; *Cumnock* v. *Little Rock*, 168 Ark. 777, 271 S. W. 466; *Matheney* v. *Independence County*, 169 Ark. 925, 277 S. W. 22; *Wright* v. *Ward*, 170 Ark. 464, 280 S. W. 369; *Martin* v. *State ex rel. Saline County*, 171 Ark. 576, 286 S. W. 873.

Finally, it is insisted that the conviction and sentence of appellant are void, on the ground that they are repugnant to article 5 of the Constitution of the United States, which provides that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger." It is also urged that the procedure is violative of that clause of the Fourteenth Amendment of the Constitution of the United States, which reads as follows: "Nor shall any state deprive any person of life, liberty, or property, without due process of law."

In an opinion written by Chief Justice TAFT, *Gains* v. *Washington*, 277 U. S. 81, 48 S. Ct. 468, 72 L. ed. 793, the Supreme Court of the United States said: "Another question raised on behalf of the defendant concerns the filing of the information for murder by the prosecuting attorney. Prosecution by information instead of by indictment is provided for by the laws of Washington. This is not a violation of the Federal Constitution." And again, in the same opinion, appears this declaration of the law: "It has been well settled for years that the first ten amendments" to the Federal Constitution "apply only to the procedure and trial of causes in the federal courts and are not limitations upon those in state courts. *Spies* v.

*Illinois,* 123 U. S. 131, 166, 8 S. Ct. 22, 31 L. ed. 80, and cases cited.''

. In *Hurtado* v. *California,* 110 U. S. 516, 4 S. Ct. 111, 28 L. ed. 232, the due process clause of the Federal Constitution was invoked by the plaintiff in error, who had been convicted of the crime of murder, committed in the state of California. The California Constitution (Art. 1, § 8) contained the following provision: ''Offenses heretofore required to be prosecuted by indictment shall be prosecuted by information, after examination and commitment by a magistrate, or by an indictment, with or without such examination and commitment, as may be prescribed by law.''

In affirming the judgment of the Supreme Court of California, the Supreme Court of the United States, at page 534 of the opinion, said: ''According to a recognized canon of interpretation, especially applicable to formal and solemn instruments of constitutional law, we are forbidden to assume, without clear reason to the contrary, that any part of this most important amendment is superfluous. The natural and obvious inference is, that in the sense of the Constitution, 'due process of law' was not meant or intended to include, *ex vi termini,* the institution and procedure of a grand jury in any case. The conclusion is equally irresistible, that when the same phrase was employed in the Fourteenth Amendment to restrain the action of the states, it was used in the same sense and with no greater extent; and that if in the adoption of that amendment it had been part of its purpose to perpetuate the institution of the grand jury in all the states, it would have embodied, as did the Fifth Amendment, express declarations to that effect. Due process of law in the latter refers to that law of the land which derives its authority from the legislative powers conferred upon Congress by the Constitution of the United States, exercised within the limits therein prescribed, and interpreted according to the principles of the common law. In the Fourteenth Amendment, by parity of reason, it refers to that law of the land in each state, which derives its authority

from the inherent and reserved powers of the state, exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all of our civil and political institutions, and the greatest security for which resides in the right of the people to make their own laws, and alter them at their pleasure.''

The principle distinction between provisions of § 1 of Amendment 22 to the Constitution of Arkansas, and the provision of California's Constitution authorizing prosecutions under information, is that as a condition precedent to the validity of prosecutions on information in California, there must have been examination and commitment by a magistrate. Omission of this requirement from the Arkansas Amendment does not deprive the accused of the rights of due process guaranteed under the Constitution of the United States.

The judgment is affirmed.