No. 45,058

THE STATE OF KANSAS, *Appellee,* v. DELMAR G. DOYLE, *Appellant.*

(441 P. 2d 846)

Opinion filed June 8, 1968.

*Russell Shultz,* of Wichita, argued the cause, and *Larry Kirby,* of Wichita, was with him on the brief for appellant.

*Donald H. Humphreys,* county attorney, argued the cause, and *Robert C. Londerholm,* attorney general, and *Robert L. Bates,* assistant county attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

FATZER, J.: The defendant, Delmar G. Doyle, was charged in an information which alleged that on or about the 10th day of March, 1966, in the county of Barton, he did unlawfully, feloniously and wilfully, maliciously, deliberately, premeditatedly, on purpose and with malice aforethought, inflict a mortal wound upon one Lawrence Lee Crouse by shooting said Crouse in the head with a firearm from which wound the said Crouse died on or about the 10th day of March, 1966, and that the defendant did kill and murder said Crouse in violation of K. S. A. 21-401. The information was duly verified by the county attorney.

The complaint charging murder in the first degree was filed on July 14, 1966. Following a preliminary examination, which was held in Great Bend on August 11, 1966, the information was filed in the district court on August 16, 1966.

On November 21, 1966, the defendant was arraigned and entered a plea of not guilty. A pretrial motion for a bill of particulars was filed asking that the state set out as nearly as possible the time within which death was known by it to have occurred. The motion was overruled. Later, the motion was renewed and again overruled.

The trial was had before a jury beginning on March 8, 1967. At the close of the state's evidence, the defendant moved for discharge which ruling was reserved by the court, and the defendant then presented his evidence. At the close of the trial on March 14, 1967, the jury returned its verdict finding "the defendant guilty of murder in the second degree as defined in the instructions and included in the information." The defendant moved the court not to accept the verdict of the jury and renewed his motion for discharge. Fol-

lowing the argument, the court overruled the motion. A motion for a new trial containing six grounds was filed, argued and overruled, and the defendant was sentenced to the Kansas State Penitentiary for a period of not less than ten years as a minimum sentence and a period of not more than ten years as a maximum sentence, or until discharged according to law.

On the facts appearing in the record, which will be hereafter narrated, the defendant seeks reversal mainly on the grounds that the state's evidence was insufficient to prove the corpus delicti and was not so conclusive as to exclude all reasonable doubt and every reasonable hypothesis except guilt, and that there was no basis in the evidence for a reasonable inference of the defendant's guilt. It should be noted the state's brief contains the statement that it agrees with the defendant's statement of facts and with minor exceptions adopted the same.

The state concedes the evidence that someone was criminally responsible for the decedent's death was all circumstantial, and due to that fact, the events and circumstances leading up to the charges filed against the defendant will be fully detailed.

On Saturday, March 12, 1966, the decedent was found dead in his automobile at approximately 9:00 o'clock a. m. by Herman Steitz, a pumper for the Bergman Oil Company. The automobile was located on a road leading from a public road up to an oil lease and tank battery. The location of the lease was five miles south, three and one-half miles east, and one-half mile south of Great Bend. The lease is owned by the Bergman Oil Company and is known as the Welch lease.

On Thursday, March 10, at approximately 2:30 p. m. Steitz was on the Welch lease road and there was nothing unusual. He was on the lease road the next day, Friday, March 11, at about 2:30 p. m. and a light colored Plymouth station wagon was parked on the east side of the road with a man slumped over against the left front window and he thought the man was asleep. He drove past the car and went on without stopping to make inquiry. The next morning, Saturday, March 12, at approximately 9:00 o'clock a. m. he again was on the lease road and the car was still there with the man in it. He stopped and saw that the man in the car had a gun in his hand and he immediately went to the farm home of Joe Hall and called the sheriff's office. He did not open any of the car doors, nor did he touch the car. Michael R. Prather, the head pumper for the

Bergman Oil Company, was in the immediate vicinity of the Welch lease between 7:30 and 8:00 o'clock on Friday morning, March 11, and he saw the light colored station wagon parked on the Welch lease road. Later in the day, he had occasion to be on a lease about ¼ mile west of the station wagon and it was still parked in the same position.

Upon receiving Steitz's call at 9:19 a. m., Jess Torrez, the deputy sheriff of Barton County, who was in charge of the office while the sheriff was out of the city, contacted the county attorney. Brock McPherson, the county attorney, Torrez, and Tom Van Brimmer, a newspaper photographer, immediately went to the scene, arriving there between 9:30 and 9:45 a. m. They found a tan or off-white colored 1966 Plymouth station wagon parked on the east side of the lease road, which ran in a north-south direction. The automobile was headed to the north. The automobile was closed, except the left front door and the right rear door were not latched securely, and the rear glass of the station wagon was open to some extent, variously described as simply open, and open six to eight inches.

The decedent, the owner of the station wagon, was seated behind the steering wheel, slumped forward and against the window glass of the door on the driver's side of the automobile. He had a single bullet wound which was at the upper extremity of the right cheek immediately beneath the bone. There was profuse bleeding from the wound and from the mouth of the decedent, so that there was blood over the seat, some of which had drained down between the seat portion and the back portion of the front seat onto the floorboard between the front and back seat of the automobile. There was blood spattered on the steering wheel, the steering column, the left front door panel, the seat, the clothing of the decedent, the dash, and on the decedent's right hand. A spot was on the inside panel of the right rear door, but it was never established to be blood. The blood on the seat and on the floorboard behind the front seat was still wet.

A .22 caliber pistol was on the seat beside the body and the right hand of the decedent was over the pistol. Part of the hand was touching the pistol which was pointing away from the body, but it was not gripped in the hand. Photographs were made of the inside and outside of the automobile, the decedent, and the scene before anything was moved. A photograph of the decedent's right hand showed a spattering of blood on the hand and a spot of blood on

the barrel of the gun near the front sight. The pistol was carefully removed from under the decedent's hand and placed in a plastic bag, and the body was removed and taken to the Central Kansas Medical Center where a post-mortem examination was performed. The automobile was locked and towed into Great Bend and stored in a warehouse. There was no indication from any physical evidence at the scene that any other person had been in the automobile, or in the vicinity of the automobile, immediately prior to or at the time of death. The investigating officers believed that the decedent had committed suicide.

The first indication to the contrary developed in the mind of Dr. Jerome T. Saylor, who performed the autopsy on the deceased as a part of his duty as district coroner. Upon his post-mortem examination, he determined there was a possibility the death was not a suicide. He summoned a coroner's jury before which he and the county attorney presented the facts as they were then known, together with the findings of the coroner, and added a considerable amount of conjecture and speculation so that the jury came to a conclusion there was, or had been, a homicide committed by "person or persons unknown."

It is difficult to prosecute a murder charge without having a defendant, and the authorities set about to find one for their supposed crime. They ascertained the pistol found in the automobile was in fact the one that discharged the fatal shot. They learned the defendant owned the pistol, which he readily admitted along with the fact that it had been registered with the Great Bend Police Department for approximately twelve years. The defendant further stated, as was corroborated by Mrs. Crouse, wife of the decedent, that the decedent had borrowed the pistol from the defendant two or three weeks prior to the incident of his death because of some vandalism, window-peeping and prowling incidents around his neighborhood, which had in fact occurred.

Upon checking into the relationship of the defendant and the decedent, it was learned that they had been friends for about eighteen years. They were friends prior to their marriages, and since then their families became friends. Both men worked together in the Junior Chamber of Commerce, and with their wives, they belonged to a couple of dance clubs in Great Bend. They were together much of the time as a foursome. The decedent was a partner in the Steinert-Crouse Oil Company, a distributor of Texaco Petroleum

Products. The defendant was a debit insurance agent, that is, he sold insurance policies on which the premiums were paid in short terms—by week or month, and he would go to the home of the policy holder and collect the premiums. The decedent carried his insurance with the defendant's company, and two of the policies had been sold to him by the defendant. All of these policies carried a two-year suicide clause and the anniversary date of the last policy purchased by the decedent was March 11, 1964.

There was evidence that the defendant and Mrs. Crouse had been having intimate relations for a period of over four years. There was some evidence that this had been suspected by their respective spouses, but was unknown. There was evidence they did not intend to divorce their spouses and marry each other because of their concern over the young children of both couples. There was further evidence they intended to stop their so-called affair.

The state presented evidence to the effect that some policy loan applications, that is, applications for loans against the cash value of the insurance policies carried by the decedent, had been filled out, purportedly signed by the decedent, and purportedly witnessed by the defendant. The state presented a handwriting expert who testified that the signatures purporting to be those of the decedent were not genuine signatures and it was not possible to identify who was the writer of the signatures, nor was the expert able to say whether any of the signatures purporting to be those of the decedent were in the handwriting of the defendant, or whether one signature or the other was made with the same ink, or made at the same time, or made with the same pen; nor was there any evidence that what purported to be the signature of the defendant was in fact his signature. Moreover, there was no showing where the applications were when the state obtained them, or who had custody of them, or whether they had been filed with the insurance company, or whether any money was obtained for them, and if so, how much, by whom, and what was done with it. The district manager of the insurance company testified he controlled the policies written in that area for the company and that he had a record of policies on the life of the decedent, but he was not questioned about the loan applications, and particularly those introduced by the state.

The state presented evidence that the decedent worked late the evening of March 10, delivering fuel north of Great Bend and drove his delivery truck home and parked it in front of his house at about

8:00 o'clock p. m. He remained at home for about two hours where he changed his clothes and talked with his wife and children. However, he seemed to be a little nervous. Mrs. Crouse testified he left the house about 10:30 because she remembered the news had been on and they had some discussion about Vietnam following the news. They had discussed the automobile and the necessity of getting some gasoline in the car and she assumed when he left he was going to the bulk plant to put gasoline in the car. Mr. Crouse never returned to his home. When her husband had not returned by morning, Mrs. Crouse began making telephone calls in an effort to locate him. She called a friend, Karmen Hulse, early in the morning, who came to the Crouse home and stayed with her. While Karmen Hulse was there, she called the decedent's mother; the defendant's wife at their home in Ellinwood; the defendant at his office in Great Bend, and the decedent's partner, Mr. Steinert, but none of those people had seen her husband. As hereafter noted, the defendant came to the Crouse home after Mrs. Crouse called him. Mr. Steinert advised her that it would not be necessary to call the police unless Mr. Crouse had not shown up by 9:00 a. m. since he was pretty responsible with regard to reporting for work. However, when her husband had not returned by 9:00 o'clock, Mrs. Crouse called the police department and asked that they keep a lookout for him. She made several more calls to the police or sheriff's office about her husband being missing prior to the time that his body was discovered. On Friday evening, March 11, Mrs. Crouse called the decedent's mother who came and spent the night with her. At approximately 8:30 a. m. on March 12, she called the police again, determined that her husband was missing and that a missing persons report should be made. Shortly thereafter, she called to add that a .22 caliber revolver which had been in her husband's dresser drawer was gone and she believed that her husband might have it with him—she learned the gun was missing while putting some clothes in his drawer.

As indicated, the court reserved its ruling on the defendant's motion for discharge at the close of the state's evidence. The posture of the case then required that the defendant present evidence. He offered a reasonably satisfactory account of his whereabouts during the entire night of March 10, and, in particular, during the time the offense was alleged to have been committed. He was corroborated by five witnesses whose positive testimony that they saw the de-

fendant prior to and during the entire time, was in no manner impeached.

The evidence showed, and it was uncontroverted, that on the evening of March 10, the defendant had visited a friend, Cloyd Peterson, who was also a friend of the decedent. The defendant arrived at the Peterson home about 7:15 p. m. for the purpose of collecting an insurance premium due on that date from Peterson's oldest son, but since the son was not home, he talked with Mr. Peterson. They became involved in discussing plans for the square dance club the Crouses, the Doyles and the Petersons belonged to, and made plans for future dances, and for the decedent to do some "calling." The defendant did not leave the Peterson home until after the newscast, that is, about 10:20 or 10:30 p. m. The defendant's wife testified she was at their home in Ellinwood during the evening of March 10, writing letters, and that her husband arrived home between 11:00 and 11:15 p. m. She was sure of the time because she had checked it as the church bell chimed shortly before the defendant's arrival. The defendant testified that after he left the home of Cloyd Peterson, he went by his office and there obtained some mail to be deposited in the post office. After depositing the mail, he drove to his home, arriving between 11:00 and 11:15 p. m., where he remained the rest of the night. His wife corroborated the fact he did not go out again, stating she was a light sleeper and would have known if he had left.

The defendant left home at about 7:45 a. m. the following morning, March 11, and went to his office. He received a telephone call from Mrs. Crouse, who had also contacted his wife at their home, asking if he had seen or heard from the decedent. After talking with her, the defendant went to the Crouse home and talked with Mrs. Crouse. Karmen Hulse was there and the defendant stayed about 45 minutes, and left. He checked the motels in the vicinity; he went to a barber shop; he went to the decedent's place of business and talked with his partner, and did what he could to locate the decedent. The defendant accounted for his whereabouts from 7:15 p. m. on the evening of March 10, until the evening of March 11, believing that was sufficient time to show uncontroverted alibi on his part according to the theory on which the case was tried by the state. The only possible gap in the time of alibi was from 10:20 or 10:30 p. m. on March 10, until about 11:00 or 11:15 o'clock that evening. This period was accounted for by the defendant, but this

was the only period of time that he was uncorroborated. The body of the decedent was found at a location ten miles south and east of the city of Great Bend. The city of Ellinwood, where the defendant lived, is ten or twelve miles east of Great Bend. It would seem impossible for the defendant to leave the home of Mr. Peterson at 10:20 or 10:30 p. m., go to his office, the post office, go out into the country ten miles, locate the decedent, commit a murder, and be at his home ten or twelve miles away in the space of thirty to forty minutes. In addition to the foregoing, the defendant specifically denied any connection whatsoever with the death of the decedent.

On the basis of this circumstantial evidence and the conclusions of the coroner, the defendant was taken into custody on July 14, 1966—more than four months after the search for the supposed murderer had begun. There was a complete lack of evidence of any dislike between the decedent and the defendant, or any animosity between them. There was no evidence of any malice, ill-will, threats or intent of any kind. There was absolutely no physical connection between the defendant and the location of the body, or the wound suffered by the decedent. Nevertheless, there was a trial—and the trial was for murder in the first degree, even though the greatest offense that tended to be established by the evidence was adultery, or possibly forgery, and a summary of the evidence on the latter point has been noted.

In order for there to have been a trial at all, there must have been a crime committed. The defendant vigorously asserts the state's evidence failed to prove that any crime had indeed been committed, that is, that it failed to prove the body of the crime or corpus delicti. It is argued that in a homicide charge, the state is required to prove the death and then prove that death resulted from some criminal agency, and in so doing, the state is required to negate accidental or natural causes, and that the death was not suicidal.

It is uniformly held by American courts that, in homicide cases, the corpus delicti is the body or substance of the crime which consists of the killing of the deceased by some criminal agency, and is established by proof of the two facts, that one person was killed, and that another person killed him. ( 3 Warren on Homicide [Perm. Ed.], § 270, pp. 107, 108; 1 Underhill's Criminal Evidence [5th Ed.], § 35, p. 46; 1 Wharton's Criminal Law and Procedure, § 66, p. 143.) Our own cases are to the same effect. (*State v. Winner,* 17 Kan.

298; *State v. Davis*, 48 Kan. 1, 28 Pac. 1092; *State v. Nordmark*, 84 Kan. 628, 114 Pac. 1068; *State v. King*, 111 Kan. 140, 206 Pac. 883.)

The corpus delicti may be proved by the direct testimony of persons who saw the acts, or by indirect and circumstantial evidence, or partly by one and partly by the other. It is never presumed, and proof of death alone is not sufficient to establish the corpus delicti, the state must show the death of a human being and the fact that death was criminally caused; otherwise, a conviction of homicide cannot be sustained. The degree of proof is stated in 3 Warren on Homicide, *op. cit., supra*, as follows:

"No exclusive mode of proof of the corpus delicti is prescribed by law. It may be shown by any evidence which establishes that fact beyond a reasonable doubt. It may be proved by direct evidence, by inspection and identification of the body, or by circumstantial evidence sufficient to prove the fact beyond reasonable doubt. Direct evidence is not required in all cases. It is not where only circumstantial proof is obtainable under the circumstances, as where the identity of the body is completely destroyed by fire or other means. Circumstantial evidence is sufficient, if strong and cogent, if it excludes every hypothesis other than guilt, or leaves no room for reasonable doubt. Circumstantial evidence is sufficient, if it is the best evidence available. The evidence should be acted upon with great caution, and weighed with scrupulous circumspection, especially where a public desire to detect a crime creates a tendency to exaggerate. The facts must be not only consistent with the guilt of the defendant, but must be inconsistent with the hypothesis of innocence." (pp. 113, 114, 115.)

See, also, 1 Underhill's Criminal Evidence [5th Ed.], § 37, p. 53.

In *State v. Cardwell*, 90 Kan. 606, 135 Pac. 597, L. R. A. 1916B, 745, it was held that proof of the corpus delicti, like any other element of the crime, is to be established by competent evidence beyond a reasonable doubt; the rule being that the best evidence which, in the nature of the case, is attainable should be produced, and to sustain conviction, all of the facts must be consistent with each other and with the main fact to be proved, and be so conclusive as to exclude all reasonable doubt. In *State v. King*, supra, the celebrated trial of Dr. Webster of Harvard, for the murder of Dr. Parkman, is cited. (*Commonwealth v. Webster*, 59 Mass. 295, 52 A. D. 711, Trial of Prof. Webster [Cockcroft & Co., N. Y., 1879], §§ 548, 556, *et seq.*) The case involved Chief Justice Shaw's charge to the jury, and it was said:

". . . This charge divides itself into two principal questions, to be resolved by the proof; first, whether the party alleged to have been murdered came to his death by an act of violence inflicted by any person; and if so, secondly, whether the act was committed by the accused.

"Under the first head we are to inquire and ascertain, whether the party alleged to have been slain is actually dead; and, if so, whether the evidence is such as to exclude, beyond reasonable doubt, the supposition that such death was occasioned by accident or suicide, and to show that it must have been the result of an act of violence.

"When the dead body of a person is found, whose life seems to have been destroyed by violence, three questions naturally arise. Did he destroy his own life? Was his death caused by accident? Or was it caused by violence inflicted on him by others?" (1. c 308, 309.)

The authorities and text writers agree that where the circumstances point no more strongly to criminal homicide than to death by natural causes, accident or suicide, it must be shown the death did not result from accidental or natural causes, and was not suicidal. (*State v. Reynolds*, 42 Kan. 320, 324, 22 Pac. 410, 16 A. S. 483; 3 Warren on Homicide, *op. cit., supra*, § 270, p. 109; 1 Underhill's Criminal Evidence, *op. cit., supra*, § 25, p. 49; Starkie on Evidence, [*863], p. 861; 7 Wigmore on Evidence [3d Ed.], § 2072, p. 402; 41 C. J. S., Homicide, § 312 d. [1], p. 12; 26 Am. Jur., Homicide, § 482, p. 490.)

If the evidence is fairly susceptible to the construction that death was accidental, or the result of suicide, or due to natural cause, then it is not sufficient to warrant a conviction, for the reason that in order to convict a defendant he must be proven guilty of the crime charged beyond a reasonable doubt. (*State v. Child*, 40 Kan. 482, 485, 20 Pac. 275.) Where the circumstances are as consistent with the absence as well as the presence of crime, the corpus delicti has not been proved since the evidence is susceptible to a construction which will prove innocence as well as guilt. (*State v. Kindle et al.*, 71 Mont. 58, 227 Pac. 65, 67; *People v. Ahrling*, 279 Ill. 70, 116 N. E. 764; *State v. Nolan*, 92 Iowa 491, 61 N. W. 181; *State v Flanagan*, 26 W. Va. 116; *Martin v. State*, 102 Ga. App. 216, 115 S. E. 2d 859; *Tate v. People*, 125 Colo. 527, 247 P. 2d 665; *State of Maine v. Peterson*, 145 Me. 279, 75 A. 2d 368; *Penton v. State*, 194 Ark. 503, 109 S. W. 2d 131; *Spain v. State*, 37 Ala. App. 311, 68 So. 2d 53, cert. den. 259 Ala. 606, 68 So. 2d 58; *State v. Brown*, 236 La. 562, 108 So. 2d 233; *Hendrickson v. Commonwealth*, 314 Ky. 464, 235 S. W. 2d 981; *Alexander v. Commonwealth* [Ky.], 277 S. W. 2d 17.) See, also, 23 C. J. S., Criminal Law, § 916 (5), p. 636.

Turning to the facts of this case, there can be no question but that the deceased met his death sometime between 10:30 p. m., on March 10, 1966, and approximately 9:00 a. m. on March 12, 1966.

Assuming there was no mistake, the automobile had been there since early Friday morning, March 11, 1966. The deceased was alone in his car. There were no physical facts which indicated that any person had been present in or about the station wagon or around the location where the car was found. A single bullet wound was in the side of the decedent's head at the upper extremity of the cheek beneath the bone. A gun was on the seat beside him, the thumb being the nearest digit to the trigger. There was blood spattered on the right hand and a spot of blood was on the barrel of the gun near the muzzle. The weather was clear and sunny, not particularly cold; the body had stiffened by the time it was removed, but the blood on the seat and on the floor of the car was still wet. All of these matters were recorded by physical facts or by photographic evidence. The officers and the photographer believed that death was the result of suicide.

After the body was removed and the automobile taken into Great Bend, the sheriff "dusted" the automobile for fingerprints. He examined and dusted the doors and the door handles and found fingerprints, but they were "smudged" and of no value for identification purposes. Likewise, he found no blood or spots of blood on the outside of the doors or on the door handles. The gun was taken to the laboratory of the Kansas Bureau of Investigation, where it was dusted for fingerprints. Fingerprints were found on the gun but they too were "smudged" and none could be used for identification. As indicated, the gun found in the automobile and almost in the hand of the deceased, had been in his possession for two or three weeks prior to the date the body was discovered.

The pathologist made a complete post-mortem of the body and drew conclusions which formed the basis of the trial. Although he had completed his training less than two years prior to the time he examined the decedent's body, and admitted much of his "experience" was limited to pictures of wounds which he had seen in books, he testified he felt that this was a case involving homicide. However, as hereafter indicated, his opinion of homicide was based almost entirely upon considerations other than medical findings.

The pathologist testified at the preliminary examination that death would have occurred within a very few minutes after the shot and that the decedent had been dead more than four hours and probably less than twelve hours when he saw him. On the theory of the state, that testimony would tend to exonerate the

defendant. At the trial, the pathologist stated he was unable to say the time when death had occurred within reasonable limits. He further testified the bullet wound beneath the bone along the cheek was smooth; that there was no smudge around the wound although there was a ring around the entrance point; that the bullet entered the cavity of the mouth, passed through the mid-brain, which caused death, and was found lodged in the left portion of the skull; that there was no tearing of the skin around the wound or so-called "tattoo" marks on the face, but there was powder directly in the wound entrance, a considerable amount about halfway through the cheek and some in the midbrain; that the bullet entered the face at an angle of about forty degrees upward and a little posteriorly, and that microscopic sections of skin around the external area of the wound indicated no powder burns or powder. There was no evidence that the roof of the mouth or the mouth cavity was tested for powder. Over objection of the defendant, the pathologist stated his opinion that at the time the wound was made, the gun was more than two feet from the point of entrance.

As indicated, while the pathologist stated it was his belief the death was a homicide, he testified he based his opinion upon the following factors: First, that he did not like the location of the wound; that most pistol suicides do not shoot themselves in that location in the face, that the wound would be in the temple or the roof of the mouth or perhaps the chest, "[w]hen I say 'most,' this does not mean that you can't commit suicide by shooting yourself here—not at all. That is just that percentage-wise most of them don't." Second, that the decedent left no suicide note and that most "suicides write notes. When I say 'most,' oh, maybe fifty percent, so we will make an equivalent—half of them." Here, there was no note, but, "[t]hat doesn't mean that all suicides write notes; not at all. It just means that this is another one of the ancillary things that bothered me." Third, that most suicides owe money, whereas the decedent was paying his debts and getting along well financially. Fourth, that although the decedent had been known to take a drink, there was no alcohol or barbiturates present in his blood. The fifth factor was stated as follows:

"The thing that bothered me   .   .   .   was the gun next to the skin, or was it further than two feet away when it was shot   .   .   ."
The pathologist's conclusion the gun was fired more than two feet

away was based on the lack of tearing of the skin, and that there was no smudge on the external flesh or skin around the wound. On this point his testimony was highly confusing, uncertain, and lacked that substance of excluding every hypothesis other than guilt.

Apparently to gain support for his theory the wound was not of a contact nature, the pathologist made tests by firing bullets into a beef tongue and a chicken breast with a different brand and type of ammunition than had been in the gun which fired the fatal bullet into the decedent. He testified the bullet "blew the whole side of the chicken out." He admitted the beef tongue contained no cavity as the human mouth. He also admitted those two items would be quite different from the human face, and it would be difficult to compare the area where the decedent was shot with such tests. While we do not pass upon the admissibility of this evidence, its relevance is extremely doubtful. Be that as it may, the pathologist testified a contact wound would leave a jagged edge or tear, or an imprint of powder spreading out away from the wound more than he thought was present in this case. He further testified that some contact wounds split the skin and some do not; that the tearing was caused generally by the explosion of gas, and he then stated:

". . . This doesn't always hold true. Sometimes, and it is documented, contact wounds can have an entry site that is not split or is not torn. The usual contact wound that is torn is one that is the skin surface over a bony prominence, for instance up here in the forehead, because the gases that come out with the bullet have got no place to go, they hit the bone, they 'poof', and they tear it. Now, in Mr. Crouse's case, the bullet went into a hollow cavity, into the mouth; so, should it have torn the cheek, or shouldn't have have? I can't answer you . . ."

On this point, Dr. LeMoyne Snyder, whom the pathologist in this case recognized as an authority on Homicide Investigations, states that the one exception of the tearing of tissue or skin on a contact wound is where the explosive gas of firing the gun passes into a cavity, so that the gases can expand within the cavity.

The pathologist further stated that if the muzzle of a gun is pressed tightly against the skin of the face and a bullet fired into the mouth cavity with a small caliber weapon, it was possible there would be no smudging around the external portion of the wound, and when asked whether that could have happened in this case, he answered, "[o]h, absolutely, no argument about that." The pathologist agreed that Dr. Gonzalez is an authority on pathology and his book entitled "Legal Medicine, Pathology and Toxicology" was

widely read and considered an authority in the field of pathology. He was shown a picture on page 397 of the book and asked if the photograph of the wound shown thereon did not appear like the entrance or penetrating wound he found in the face of the decedent, and he answered, "[s]ure does, yes, sir; no argument." He further testified that Gonzalez's comment beneath the picture showed the wound to be a contact wound with a .22 pistol, and he further stated he was glad to see it, "[i]t is interesting. I didn't pay much attention to it. I don't know."

The sixth factor was that the nitrate test on the decedent's hand was negative. During the post-mortem, the deputy sheriff made a paraffin cast of the decedent's right hand which was taken to the K. B. I. laboratory for a dermal nitrate test. Apparently the deputy sheriff assumed the gun had been held in a normal shooting position with the index finger on the trigger. Thus, only the back of the decedent's hand was examined for nitrates; the test did not include the palm where the nitrates would normally have struck had the gun been triggered with the thumb. The test was not negative; there was a small amount of nitrate found on the base of the hand near the little finger as if it had been residue from the firing of the gun. The pathologist testified he had heard of homicide cases in which the pistol was fired by the thumb and that this pistol could easily have been fired with the thumb triggering it, and that if the gun were triggered by the thumb, "nitrates should still be on the hand but in a different location" than tested.

The seventh factor was that usually in a suicide by pistol, the weapon would either be grasped extremely tight or it would be completely discarded by the hand, because at the time of death people jerk in the nature of a spasm. He admitted that the position of the gun in relation to the hand after death would depend pretty much on the location of the hand at the time the gun was triggered and that in this case the car seat held up the gun, that is, might have kept the gun from being completely discarded.

The pathologist stated he had no reason or explanation why the location of the wound was not or would not likely be a suicide wound, and further stated that the location of the wound would not indicate in and of itself, "that this was not a suicide." He was then asked:

"Q. You do not presume to say, do you, Doctor, that this could not have been a suicide?

"A. No, I don't, no sir."

Before concluding his testimony, the pathologist again stated that "this death certainly could be a suicide," but he still retained his original opinion of homicide for the reasons heretofore stated.

The record indicates the state was aware of the fact that its evidence did not negate the possibility of suicide, taking into consideration physical facts and photographic evidence at the scene of the death and discovered from an examination of the decedent's body and tests made, for it then presented four witnesses calculated to negate the likelihood of suicide.

The decedent's partner testified he knew nothing whatever about the decedent's personal problems, but that he was getting along alright in his business. A friend of the decedent testified he attended Reserve meetings with the decedent for a number of years and that he never discussed any family problems with him. The decedent's mother testified she last talked with the decedent some five weeks prior to his death, but she observed nothing unusual about his behavior. The testimony related is meaningless from a standpoint of negating the possibility of suicide. The mere fact the decedent failed to disclose problems of personal nature does not indicate a suicidal plan was not present. (*People v. Murphy,* 184 N. Y. Supp. 174, 193 App. Div. 177.)

The father of the decedent testified he talked with his son during the week immediately prior to the decedent's death and he noticed something was worrying him and asked what it was, and the decedent replied, "[i]t's Delmar and Donna." The evidence does no more than show the decedent was disturbed about the suspected relationship of his wife and the defendant, and would appear to be as consistent with suicide as with homicide.

We turn to the record to determine whether there is an absence of substantial evidence proving or tending to prove each and every essential element of the crime charged. (*State v. Dill,* 182 Kan. 174, 175, 319 P. 2d 172; *State v. Cooper,* 190 Kan. 101, 104, 372 P. 2d 289; *State v. Townsend,* 201 Kan. 122, 125, 439 P. 2d 70.) In a circumstantial case, it is the duty of this court to determine whether there is a basis in the evidence for a reasonable inference of the defendant's guilt. (*State v. Patterson,* 200 Kan. 176, 434 P. 2d 808; *State v. Scoggins,* 199 Kan. 108, 427 P. 2d 603.) Our law recognizes that the jury shall be the exclusive judge of all material questions of fact. But upon the question whether there was present any evidence whatever of a particular material fact, the jury is not the

exclusive judge; the law requires that the court determine that. (*Craft v. State*, 3 Kan. 450, 485; *State v. Bowen*, 16 Kan. 475; *State v. Truskett*, 85 Kan. 804, 118 Pac. 1047; *State v. Linville*, 148 Kan. 142, 79 P. 2d 869; *State v. Goldsberry*, 160 Kan. 138, 160 P. 2d 690; *State v. Jensen*, 197 Kan. 427, 441, 417 P. 2d 273.) Upon this phase of the case, it is the duty of this court to determine whether there was evidence upon each material· fact, necessary for a legal conviction. (*State v. Jensen*, supra, p. 441; *Craft v. State*, supra, p. 486.)

As heretofore stated, there was no direct proof of the defendant's guilt. It was a case of circumstantial evidence. As we see it, the principal questions are (1) whether the evidence established beyond a reasonable doubt the decedent was murdered or that the element of corpus delicti was established, and (2) whether the verdict was supported by substantial evidence.

Concerning the first question, to sustain a conviction there must be proof not only that there was a death, but that the death was caused by a criminal agency, that is, that a crime was in fact committed. The state's case rested heavily upon the testimony of the pathologist, which has been summarized. While his testimony might be said to create a possibility of the correctness of the theory of the state that criminal agency was involved, we conclude from the record that it was equivocal and was not of a conclusive nature which is necessary to sustain a conviction upon purely circumstantial evidence. Upon this point, the case of *Tate v. People,* supra, while somewhat factually different, is analogous in principle. The defendant was charged with shooting her husband with an automatic pistol and defended upon the ground the decedent had committed suicide, and it was said:

"As already may be clearly observed, the only proof relied upon in this case is purely circumstantial. However, in face of the testimony of the autopsy physician that the gunshot wounds causing death could have been self-inflicted, and that it was possible the case was one of suicide, we must say that all other circumstances are not sufficiently cogent or sufficient to exclude every reasonable hypothesis except guilt; and that the circumstances are not convincing to a moral certainty; therefore, from the record, we must, and do, determine that the corpus delicti was not established . . ." (1. c. 538.)

Considering the state's evidence in its entirety, if it could be said that it was sufficient to prove beyond a reasonable doubt the existence of a crime, it lacked that substance to exclude every reasonable hypothesis other than guilt and prove to a moral certainty that the defendant was implicated in the crime. The only physical

evidence to link him with the shooting was the fact he owned the pistol; however, corroborated evidence explained he loaned the gun to the decedent a couple of weeks prior to the death as a result of a series of disturbances in the decedent's neighborhood, which in fact had occurred. The remaining circumstantial evidence the state relied upon for a conviction was the defendant's illicit affair with the decedent's wife and that he sold some insurance policies to the decedent upon which some purportedly forged applications for loans were made. The theory of the state in presenting this evidence was that the relationship between the defendant and the decedent's wife was relevant; that the defendant would be an immediate beneficiary in conjunction with the decedent's wife; that when considered with defendant's position as the decedent's life insurance agent, his knowledge of the decedent's insurance program, his signature as a witness to the forged signatures of the deceased, and his plan and desire of life with the decedent's wife, made such evidence relevant. We examine the evidence with respect to this theory.

Over the objection of the defendant, the state presented evidence of the existence of four insurance policies on the life of the decedent. One policy was for less than $2,000, payable to the decedent's mother; another in the sum of $5,000 which was payable to his business partner; another was in the sum of $5,000 which had a rider attached entitling the beneficiary to monthly payments, and another policy in the sum of $10,000 payable to the widow or the decedent's children as contingent beneficiaries. The decedent had been insuring with the particular company long prior to the defendant becoming his agent and of the four policies the decedent owned, the defendant sold the $10,000 policy and the family income rider which was attached to a pre-existing policy.

. The obvious purpose in presenting this testimony was to raise an implication and cause the jury to speculate whether the defendant might have murdered the decedent for purposes of insurance. The defendant was not a beneficiary in any policy and the evidence would seem to have little probative value in view of the fact that the decedent's mother, his business partner and his widow were the beneficiaries under the policies. Moreover, the district manager of the life insurance company testified that the last $10,000 policy in which the wife was the beneficiary, had a two year suicide clause and was issued on March 12, 1964. The state's evidence

concerning the alleged forged applications for loans has heretofore been summarized. The state did not prove who in fact signed the loan applications, nor did it establish that the defendant's genuine signature appeared thereon. As presented, we think the evidence was wholly irrelevant to any issue in the homicide trial and was clearly inadmissible. It not only invited speculation on the part of the jury that the defendant was somehow connected with the forged loan applications, but it was highly prejudicial to him.

The state presented evidence through the county attorney and the sheriff of conversations they had with Mrs. Crouse in the absence of the defendant on the same dates they had conversations with the defendant concerning the parties' illicit relationship. The conversations took place in the sheriff's office at the sheriff's request. Both officers testified Mrs. Crouse told them of having an intimate affair with the defendant for a number of years and she indicated they might be married in the future, but they were concerned about their young children. The court admitted the testimony over the objection of the defendant that it was heresay and contrary to K. S. A. 60-460. We are of the opinion that statements made by Mrs. Crouse to the sheriff and the county attorney in the absence of the defendant were inadmissible and not binding upon him. This court considered the admissibility of similar evidence in the recent companion cases of *State v. Cantrell,* 201 Kan. 182, 440 P. 2d 580, and *State v. Weinman,* 201 Kan. 190, 440 P. 2d 575 and it was held to be hearsay evidence and inadmissible against the particular defendant.

Considered in the light most favorable to the state, it must be said the evidence of the relationship existing between the defendant and Mrs. Crouse might well raise the question of the possibility of a motive for killing the decedent. But when we look to the evidence of motive it seems to us to be reduced to irrelevancy either to establish corpus delicti or culpability. It must be remembered that motive, though an important factual element, is not sufficient in itself to sustain a conviction. (*Fyffe v. Commonwealth,* 301 Ky. 165, 190 S. W. 2d 674; *Hendrickson v. Commonwealth,* supra.)

We have not overlooked the testimony of one Krestin who lived north of the Crouse home, to the effect that he saw the decedent get into his station wagon at about 9:00 p. m. on March 10, and drive away; that someone else came out of the house who he "presumed" to be the defendant, but he was not certain and was not

sure what kind of a car that person left in. It is interesting to note the witness did not notice the decedent's truck parked in front of the house.

Similar weak evidence was produced by the newspaper photographer to the effect he saw the defendant's car at the Crouse home on the evening of March 10. On cross-examination he was not sure of the events of a year prior; could not state how he noticed the car on that particular night and was uncertain that the car he saw was the defendant's car. Moreover, other evidence came from the observances of the witness when he testified he accompanied the sheriff on April 16, 1966, to the warehouse where the decedent's car was stored, to take photographs of a spot of blood about ¼ inch in diameter found on the outside of the right front door. It seems odd that this witness testified a photograph he took prior to the removal of the body showed no spot in that position on the car and that no one had discovered the spot in question until more than one month after the original inspection. Likewise, the sheriff was unable to explain how he could have dusted the right door and handle of the decedent's automobile for finger prints and not have found the spot in question one month previous. Moreover, it should be noted that the photograph taken at the scene showed a spot of blood on the barrel of the pistol; however, that had disappeared from the weapon subsequently, and since it was a factor which supported the theory of suicide, thus detracting from the sensationalism of murder, it likewise seemed to have disappeared from the mind of the newspaper photographer.

We need not further detail the circumstantial evidence or lengthen this opinion by a discussion of the testimony of other witnesses. Any finding in this case of deliberation, premeditation, willfulness, or any of the other ingredients of either first or second degree murder could be based only upon a suspicion as foundation for a presumption, and then finally another presumption based upon the primary presumption. Presumption and inferences may be drawn only from facts established, and presumption may not rest on presumption or inference on inference (*Chandler v. Anchor Serum Co.,* 198 Kan. 571, 426 P. 2d 82; *Emigh v. Andrews,* 164 Kan. 732, 736, 191 P. 2d 901; *Schmidt v. Twin City State Bank,* 151 Kan. 667, 100 P. 2d 652; *Casey v. Phillips Pipeline Co.,* 199 Kan. 538, 551, 431 P. 2d 518), and the rule is doubly applicable in criminal cases.

In the complete absence of any evidence that the defendant

murdered the decedent, we can account for the verdict only by the feeling that the evidence of the relationship between the defendant and the decedent's wife, and the prejudicial testimony the jury heard, led it to believe that the suspicions in this case were well-founded and sufficient to warrant the defendant's conviction. But mere suspicion, however strong, is not enough and juries are not permitted to base verdicts of conviction on suspicion. (*Walters v. Commonwealth*, 291 Ky. 573, 165 S. W. 2d 153, 155.) Many years ago, in the early history of Kansas, this court, in *Horne v. State*, 1 Kan. 42, said:

"A few facts or a multitude of facts proven, all consistent with the supposition of guilt, are not enough to warrant a verdict of guilty; but, in order to convict on circumstantial evidence, it is held necessary not only that the circumstances all concur to show that the prisoner committed the crime, but that they all be inconsistent with any other rational conclusion . . ." (l. c. 72.)

This case is shrouded in mystery, but mature consideration of all the evidence adduced fails to satisfy us of its sufficiency to support and sustain the verdict rendered. We cannot say, even under the peculiar circumstances of the case, that strong probabilities or strong possibilities of the guilt of the defendant exist. However, as indicated, convictions for murder must be grounded on something more than probabilities, possibilities or suspicions of guilt. We are convinced the evidence does not support the verdict.

It is not unique in the jurisprudence of this court to reverse convictions in criminal cases, homicide or otherwise, where the record does not contain substantial evidence to sustain the verdict of the jury. (*Horne v. State*, supra; *Craft v. State*, 3 Kan. 450; *State v. Bowen*, 16 Kan. 475; *State v. Fry*, 40 Kan. 311, 19 Pac. 742; *State v. Reynolds*, supra; *State v. Diebolt*, 54 Kan. 129, 37 Pac. 992; *State v. Sweizewski*, 73 Kan. 733, 85 Pac. 800; *State v. Morton*, 91 Kan. 908, 139 Pac. 409; *State v. Truskett*, 85 Kan. 804, 118 Pac. 1047; *State v. Linville*, 148 Kan. 142, 79 P. 2d 869; *State v. Jensen*, 197 Kan. 427, 417 P. 2d 273.) This list of authorities is not intended to be exhaustive. It is indicative that while this court is well aware that the verdict of a jury and the approval of the district court should not be disturbed upon any view of this court as to the relevant weight of conflicting evidence, after a careful study of the record and a scrutiny of the evidence, where it is unable to say that there is sufficient evidence to support the verdict, it has directed that the judgment be reversed.

If we were to order a new trial in this case, we would be holding that there was sufficient evidence to establish each and every essential element of the crime of murder. The record is wholly barren of those essential elements of the crime and being of the opinion the evidence does not support the verdict, we have no alternative but to direct the defendant be discharged.